No. 22-1008

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

SIERRA CLUB, WEST VIRGINIA RIVERS COALITION, WEST VIRGINIA
HIGHLANDS CONSERVANCY, INDIAN CREEK WATERSHED
ASSOCIATION, APPALACHIAN VOICES, and CHESAPEAKE CLIMATE
ACTION NETWORK
*Petitioners*

v.

WEST VIRGINIA DEPARTMENT OF ENVIRONMENTAL PROTECTION, and
HAROLD WARD, in his official capacity as Secretary of the West Virginia
Department of Environmental Protection
*Respondents*

and

MOUNTAIN VALLEY PIPELINE, LLC
*Intervenor-Respondent*

On Petition for Review from the
West Virginia Department of Environmental Protection's
State §401 Water Quality Certification No. WQC-21-2005 (December 30, 2021)

## PETITIONERS' FINAL OPENING BRIEF

DEREK O. TEANEY
BENJAMIN A. LUCKETT
ELIZABETH A. BOWER
APPALACHIAN MOUNTAIN ADVOCATES. INC.
P.O. Box 507
Lewisburg, WV 24901
Telephone: (304) 646-1182
Email: dteaney@appalmad.org

*Counsel for Petitioners*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.


No. __22-1008__         Caption: __Sierra Club, et al. v. W. Va. Dept. of Envtl. Protection, et al.__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__Sierra Club__
(name of party/amicus)


_____

 who is _____Petitioner_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.    Is party/amicus a publicly held corporation or other publicly held entity?    ☐YES ☑NO


2.    Does party/amicus have any parent corporations?    ☐YES ☑NO
      If yes, identify all parent corporations, including all generations of parent corporations:




3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?    ☐YES ☑NO
      If yes, identify all such owners:

4.     Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation? ☐YES ☑NO
If yes, identify entity and nature of interest:

5.     Is party a trade association? (amici curiae do not complete this question) ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.     Does this case arise out of a bankruptcy proceeding? ☐YES ☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.     Is this a criminal case in which there was an organizational victim? ☐YES ☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Derek O. Teaney        Date:    01/04/2022

Counsel for: Sierra Club

Print to PDF for Filing      Reset Form

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. __22-1008__          Caption: __Sierra Club, et al. v. W. Va. Dept. of Envtl. Protection, et al.__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__West Virginia Rivers Coalition__
(name of party/amicus)

_____

 who is _____Petitioner_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.     Is party/amicus a publicly held corporation or other publicly held entity?  ☐YES ☑NO

2.     Does party/amicus have any parent corporations?                    ☐YES ☑NO
       If yes, identify all parent corporations, including all generations of parent corporations:

3.     Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                                    ☐YES ☑NO
       If yes, identify all such owners:

4.    Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?    ☐YES ☑NO
If yes, identify entity and nature of interest:

5.    Is party a trade association? (amici curiae do not complete this question)    ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.    Does this case arise out of a bankruptcy proceeding?    ☐YES ☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.    Is this a criminal case in which there was an organizational victim?    ☐YES ☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Derek O. Teaney                    Date:        01/04/2022

Counsel for: West Virginia Rivers Coalition

Print to PDF for Filing        Reset Form

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. _22-1008_      Caption: _Sierra Club, et al. v. W. Va. Dept. of Envtl. Protection, et al._

Pursuant to FRAP 26.1 and Local Rule 26.1,

_West Virginia Highlands Conservancy_
(name of party/amicus)

_____

who is _____Petitioner_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.      Is party/amicus a publicly held corporation or other publicly held entity?      ☐ YES ☑ NO

2.      Does party/amicus have any parent corporations?      ☐ YES ☑ NO
        If yes, identify all parent corporations, including all generations of parent corporations:

3.      Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?      ☐ YES ☑ NO
        If yes, identify all such owners:

4.  Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?  ☐YES ☑NO
    If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)  ☐YES ☑NO
    If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?  ☐YES ☑NO
    If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.  Is this a criminal case in which there was an organizational victim?  ☐YES ☑NO
    If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Derek O. Teaney                    Date:        01/04/2022

Counsel for: W. Va. Highlands Conservancy

Print to PDF for Filing          Reset Form

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.


No. __22-1008__        Caption: __Sierra Club, et al. v. W. Va. Dept. of Envtl. Protection, et al.__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__Indian Creek Watershed Association__
(name of party/amicus)

_____

 who is _____Petitioner_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.    Is party/amicus a publicly held corporation or other publicly held entity?    ☐YES ☑NO


2.    Does party/amicus have any parent corporations?    ☐YES ☑NO
      If yes, identify all parent corporations, including all generations of parent corporations:


3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?    ☐YES ☑NO
      If yes, identify all such owners:

4.  Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?  ☐YES ☑NO
    If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)  ☐YES ☑NO
    If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?  ☐YES ☑NO
    If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.  Is this a criminal case in which there was an organizational victim?  ☐YES ☑NO
    If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Derek O. Teaney                    Date:        01/04/2022

Counsel for: Indian Creek Watershed Association

Print to PDF for Filing     Reset Form

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.


No.  22-1008          Caption:  Sierra Club, et al. v. W. Va. Dept. of Envtl. Protection, et al.

Pursuant to FRAP 26.1 and Local Rule 26.1,

Appalachian Voices
(name of party/amicus)


who is          Petitioner          , makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.    Is party/amicus a publicly held corporation or other publicly held entity?     ☐YES ☑NO


2.    Does party/amicus have any parent corporations?                  ☐YES ☑NO
      If yes, identify all parent corporations, including all generations of parent corporations:




3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                                    ☐YES ☑NO
      If yes, identify all such owners:

4.    Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?    ☐YES ☑NO
If yes, identify entity and nature of interest:

5.    Is party a trade association? (amici curiae do not complete this question)    ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.    Does this case arise out of a bankruptcy proceeding?    ☐YES ☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.    Is this a criminal case in which there was an organizational victim?    ☐YES ☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Derek O. Teaney                    Date: _____01/04/2022_____

Counsel for: Appalachian Voices

Print to PDF for Filing        Reset Form

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. __22-1008__          Caption: __Sierra Club, et al. v. W. Va. Dept. of Envtl. Protection, et al.__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__Chesapeake Climate Action Network__
(name of party/amicus)

_____

who is _____Petitioner_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.     Is party/amicus a publicly held corporation or other publicly held entity?   ☐YES ☑NO

2.     Does party/amicus have any parent corporations?                    ☐YES ☑NO
       If yes, identify all parent corporations, including all generations of parent corporations:

3.     Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                                  ☐YES ☑NO
       If yes, identify all such owners:

4.   Is there any other publicly held corporation or other publicly held entity that has a direct
financial interest in the outcome of the litigation?                    ☐YES ☑NO
If yes, identify entity and nature of interest:

5.   Is party a trade association? (amici curiae do not complete this question)     ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected
substantially by the outcome of the proceeding or whose claims the trade association is
pursuing in a representative capacity, or state that there is no such member:

6.   Does this case arise out of a bankruptcy proceeding?                    ☐YES ☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a
party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the
caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held
corporation that owns 10% or more of the stock of the debtor.

7.   Is this a criminal case in which there was an organizational victim?          ☐YES ☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational
victim of the criminal activity and (2) if an organizational victim is a corporation, the
parent corporation and any publicly held corporation that owns 10% or more of the stock
of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Derek O. Teaney                         Date:        01/04/2022

Counsel for: Chesapeake Climate Action Network

Print to PDF for Filing          Reset Form

## **<u>TABLE OF CONTENTS</u>**

**<u>PAGE:</u>**

DISCLOSURES OF CORPORATE AFFILIATIONS ............................................. i

TABLE OF CONTENTS ......................................................... xiii

TABLE OF AUTHORITIES.................................................... xvi

INTRODUCTION ................................................................. 1

STATEMENT OF SUBJECT MATTER AND APPELLATE JURISDICTION ..... 2

STATEMENT OF ISSUES PRESENTED FOR REVIEW ..................................... 6

STATEMENT OF THE CASE .................................................. 7

     *Nature of the Case* ........................................... 7

     *Legal Framework* ........................................... 7

     *Statement of Facts* .......................................... 11

         *MVP's Initial Efforts to Permit Waterbody Crossings* ...................... 11

         *MVP's Documented Water Quality Standards and Permit Violations* ...................................... 14

         *MVP's Most Recent Efforts to Permit Waterbody Crossings* ............. 16

SUMMARY OF THE ARGUMENT..................................................... 22

ARGUMENT.................................................................... 28

     Standard of Review ........................................ 28

     Discussion of the Issues.................................... 29

I.     WVDEP   ARBITRARILY   AND   CAPRICIOUSLY
       DISREGARDED   ITS   OWN   FINDINGS   THAT   MVP
       REPEATEDLY VIOLATED THE STORMWATER PERMIT
       AND WATER QUALITY STANDARDS .........................................30

       A.     WVDEP's Reasoning Is Implausible And Internally
              Inconsistent .................................................................................30

       B.     WVDEP Arbitrarily And Capriciously Applied The
              Wrong Legal Standard ................................................................34

II.    WVDEP   UNLAWFULLY   FAILED   TO   INCLUDE
       REQUIRED CONDITIONS IN THE CERTIFICATION .................36

III.   WVDEP'S   CONCLUSION   THAT   MVP'S   STREAM-
       CROSSING   PLANS   ARE   CONSISTENT   WITH   THE
       AGENCY'S   BMP   MANUAL   IS   ARBITRARY   AND
       CAPRICIOUS ......................................................................................39

       A.     MVP's Crossing Methods Are Inconsistent With the BMP
              Manual Because MVP Intends To Use Open-Cut
              Crossings   Without   Credibly   Establishing   The
              Impracticability of Trenchless Methods ...................................41

       B.     MVP's Crossing Plans Are Inconsistent With The BMP
              Manual Because MVP Intends To Trench Through
              Streams With Large Drainage Areas ........................................45

IV.    WVDEP'S BELIEF THAT EPA ENDORSES BMPS DURING
       INSTREAM   CONSTRUCTION   TO   PROTECT   WATER
       QUALITY   STANDARDS   RUNS   COUNTER   TO   THE
       RECORD .............................................................................................47

V.     WVDEP ARBITRARILY AND CAPRICIOUSLY REFUSED
       TO   CONDUCT   LOCATION-SPECIFIC
       ANTIDEGRADATION REVIEWS ...................................................50

       A.     WVDEP Impermissibly Relied On Surrogates For
              Location-Specific Antidegradation Review ..............................51

1.　West Virginia's Antidegradation Program Does Not Authorize Reliance On BMPs For Point Sources ................................................................52

2.　WVDEP Cannot Rely On Other Environmental Processes To Satisfy Substantive Antidegradation Requirements ................................................................54

B.　Location-Specific Antidegradation Review of §404 Discharges Is Required, Possible, and Valuable ......................57

CONCLUSION ................................................................62

REQUEST FOR ORAL ARGUMENT ................................................................62

CERTIFICATE OF COMPLIANCE ................................................................63

CERTIFICATE OF SERVICE ................................................................64

# <u>TABLE OF AUTHORITIES</u>

<u>PAGE(S):</u>

<u>CASES</u>:

*Am. Canoe Ass'n v. Murphy Farms, Inc.*,
  326 F.3d 505 (4th Cir. 2003)......................................................................2

*Am. Canoe Ass'n v. Murphy Farms*,
  412 F.3d 536 (4th Cir. 2005)....................................................................35

*Animal Legal Def. Fund v. Perdue*,
  872 F.3d 602 (D.C. Cir. 2017) ............................................................32, 33

*ANR Storage Co. v. FERC*,
  904 F.3d 1020 (D.C. Cir. 2018) ......................................................25, 29, 32

*Atl. Coast Pipeline, LLC v. Nelson County Bd. of Supervisors*,
  443 F.Supp.3d 670 (W.D. Va. 2020) ........................................................38

*Coeur Alaska, Inc. v. Southeast Alaska Conservation Council*,
  557 U.S. 261 (2009) ............................................................................27, 49

*Colo. Fire Sprinkler, Inc. v. N.L.R.B.*,
  891 F.3d 1031 (D.C. Cir. 2018) ................................................................44

*Crutchfield v. Cty of Hanover, VA*,
  325 F.3d 211 (4th Cir. 2003)....................................................................44

*Defs. of Wildlife v. U.S. Dep't of Interior*,
  931 F.3d 339 (4th Cir. 2019).........................................................25, 29, 31

*Feathers v. W. Va. Bd. of Med.*,
  562 S.E.2d 488 (W. Va. 2001).............................................................53, 54

*Friends of Back Bay v. U.S. Army Corps of Eng'rs*,
  681 F.3d 581 (4th Cir. 2012)....................................................................58

*Friends of Buckingham v. State Air Pollution Control Bd.*,
  947 F.3d 68 (4th Cir. 2020)......................................26, 29, 42, 45, 56

*Friends of the Earth v. Hintz*,
  800 F.2d 822 (9th Cir. 1986) ................................................44, 45

*Hoyt v. Russell*,
  117 U.S. 401 (1886) .............................................................46, 47

*In re Clean Water Act Rulemaking*,
  ___ F.Supp.3d ___, 2021 WL 4924844 (N.D. Val. Oct. 21, 2021) ...............8

*Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am. v. Zantop Air Transp. Corp.*, 394 F.2d 36 (6th Cir. 1968)................................15

*Islander E. Pipeline Co., LLC v. McCarthy*,
  525 F.3d 141 (2d Cir. 2008) ......................................................39

*Jones v. C.I.R.*,
  642 F.3d 459 (4th Cir. 2011) ......................................................9

*Lake Carriers' Ass'n v. E.P.A.*,
  652 F.3d 1 (D.C. Cir. 2011) ......................................................37

*Lujan v. Defenders of Wildlife*,
  504 U.S. 555 (1992) ................................................................5

*Manchin v. Dunfee*,
  327 S.E.2d 710 (W. Va. 1984) ...................................................54

*Mayor of Baltimore v. Azar*,
  973 F.3d 258 (4th Cir. 2020)........................................31, 32, 43

*McMellon v. United States*,
  387 F.3d 329 (4th Cir. 2004)......................................................36

*Mountain Valley Pipeline, LLC v. N.C. Dep't of Envtl. Quality*,
  990 F.3d 818 (4th Cir. 2021) ......................................................10

*Mountain Valley Pipeline, LLC v. Wender,*
     337 F.Supp.3d 656 (S.D. W. Va. 2018) ........................................39

*Nat'l Parks Conservation Ass'n v. E.P.A.,*
     788 F.3d 1134 (9th Cir. 2015) ....................................................32

*Natural Res. Defense Council v. U.S. E.P.A.,*
     16 F.3d 1395 (4th Cir. 1993) ....................................................8, 9

*N.C. Dep't of Envtl. Quality v. FERC,*
     3 F.4th 655 (4th Cir. 2021)....................................25, 26, 37, 38, 39

*Ohio Valley Envtl. Coalition v. Foal Coal Co., LLC,*
     845 F.3d 133 (4th Cir. 2017) ......................................................59

*Ohio Valley Envtl. Coalition v. Horinko,*
     279 F.Supp.2d 732 (S.D. W. Va. 2003) ...........................27, 50, 57

*Ohio Valley Envtl. Coalition v. Pruitt,*
     893 F.3d 225 (4th Cir. 2018).............................................1, 58, 59

*Ohio Valley Envtl. Coalition, Inc. v. U.S. Army Corps of Eng'rs,*
     716 F.3d 119 (4th Cir. 2013) ......................................................59

*Piney Run Pres. Ass'n v. Cty. Comm'rs of Carroll Cty., MD,*
     268 F.3d 255 (4th Cir. 2002).........................................................3

*PUD No. 1 of Jefferson Cty. v. Washington Dep't of Ecology,*
     511 U.S. 700 (1994) ............................................................8, 9, 36

*Schneidewind v. ANR Pipeline Co.,*
     485 U.S. 293 (1988) ....................................................................38

*Sierra Club v. State Water Control Bd.* ("*SWCB*"),
     898 F.3d 383 (4th Cir. 2018)..............................................*passim*

*Sierra Club v. Union Oil Co.,*
     813 F.2d 1490 (9th Cir. 1987), *judgment vacated*, 485 U.S. 931 (1988),
     *judgment reinstated*, 853 F.2d 667 (9th Cir. 1988) ......................35

*Sierra Club v. U.S. Army Corps of Eng'rs* ("*Sierra Club I*"),
  909 F.3d 635 (4th Cir. 2018)................................1, 13, 29, 38, 43, 54, 55, 57

*Sierra Club v. U.S. Army Corps of Eng'rs* ("*Sierra Club II*"),
  981 F.3d 251 (4th Cir. 2020)...................................2, 11, 12, 17, 19

*Sierra Club v. U.S. Dep't of the Interior*,
  899 F.3d 260 (4th Cir. 2018).......................................................15

*Sierra Club v. U.S. Forest Serv.*,
  897 F.3d 582 (4th Cir. 2018)................................................*passim*

*Southern Appalachian Mountain Stewards v. A&G Coal Corp.*,
  758 F.3d 560 (4th Cir. 2014)......................................................11

*State of S.C. ex rel. Tindal v. Block*,
  717 F.2d 874 (4th Cir. 1983).......................................................45

*Stoddard v. W. Carolina Reg'l Sewer Auth.*,
  784 F.2d 1200 (4th Cir. 1986)....................................................35

*United States v. Johnson*,
  726 F.2d 1018 (4th Cir. 1984)....................................................46

*Wild Virginia v. U.S. Forest Serv.*,
  24 F.4th 915 (4th Cir. 2022)..........................................25, 29, 32, 34, 35, 61

*Williams Gas Processing-Gulf Coast Co., L.P. v. FERC*,
  475 F.3d 219 (D.C. Cir. 2006) ...............................................29, 40

## **FEDERAL CONSTITUTIONAL PROVISIONS**:

Article III of the United States Constitution............................................2

## **FEDERAL STATUTES**:

5 U.S.C. §706(2)(A) ......................................................24, 28, 38

15 U.S.C. §717f.............................................................................2

15 U.S.C. §717r(d)(1) ..................................................................2, 7, 28

33 U.S.C. §1313 ......................................................................................8

33 U.S.C. §1313(c)(2)(a) .......................................................................8

33 U.S.C. §1341 (Clean Water Act §401) ...................................*passim*

33 U.S.C. §1341(a)(1) ...........................................................................7

33 U.S.C. §1341(d) (Clean Water Act §401(d ...........6, 26, 36, 37, 38, 39

33 U.S.C. §1342 (Clean Water Act §402) ........................................48, 49

33 U.S.C. §1342(a)(1) .........................................................................48

33 U.S.C. §1342(p) ..............................................................................48

33 U.S.C. §1344 (Clean Water Act §404) ...................................*passim*

33 U.S.C. §1344(b) ..............................................................................49

33 U.S.C. §1344(b)(1) (Clean Water Act §404(b)(1) ......................49, 53

33 U.S.C. §1344(c) ..............................................................................49

## **FEDERAL REGULATIONS:**

18 C.F.R. §157.6(a)(4)(i) .....................................................................44

40 C.F.R. §121.2(a)(3) (2019) ...........................................7, 8, 24, 30, 35

40 C.F.R. §121.2(a)(4) (2019) .......................................................37, 38

40 C.F.R. §122.26(b)(15)(i) .................................................................48

40 C.F.R. §131 ......................................................................................8

40 C.F.R. Part 230 ................................................................................53

## STATE REGULATIONS:

W. Va. C.S.R. §47-2-3.................................................................................9

W. Va. C.S.R. §47-2-3.2...............................................................8, 9, 15, 16

W. Va. C.S.R. §47-2-3.2.a.................................................................9, 16

W. Va. C.S.R. §47-2-3.2.b.................................................................9, 16

W. Va. C.S.R. §47-2-3.2.e........................................................................9

W. Va. C.S.R. §47-2-3.2.i........................................................................9

W. Va. C.S.R. §47-2-4.........................................................................8, 9

W. Va. C.S.R. §47-2-4.1.........................................................................10

W. Va. C.S.R. §47-2-4.1.b...........................................................23, 28, 53

W. Va. C.S.R. §47-5A-4.2..............................................................10, 42

W. Va. C.S.R. §47-5A-5.1.e...................................................................45

W. Va. C.S.R. §60-5-1 *et seq* .........................................................8, 10

W. Va. C.S.R. §60-5-1.5.b..................................................23, 28, 52, 53

W. Va. C.S.R. §60-5-1.5.d..................................................23, 28, 54, 55

W. Va. C.S.R. §60-5-3.3.........................................................................10

W. Va. C.S.R. §60-5-3.4................................................10, 50, 55, 58, 59

W. Va. C.S.R. §60-5-3.5.........................................................................10

W. Va. C.S.R. §60-5-3.8...................................................................28, 53, 57

W. Va. C.S.R. §60-5-4.7.........................................................................50

W. Va. C.S.R. §60-5-5.6.a.2 ...............................................................32, 56

W. Va. C.S.R. §60-5-5.6.c ..................................................................27, 50

W. Va. C.S.R. §60-5-6.1 ...........................................................................50

**FEDERAL REGISTER:**

49 Fed. Reg. 37,998 (Sept. 26, 1984) ...............................................8, 25, 35

63 Fed. Reg. 36,742 (July 7, 1998) ...........................................................57

68 Fed. Reg. 60,653 (Oct. 23, 2003) .........................................................51

86 Fed. Reg. 69,372 (Dec. 7, 2021) ..........................................................52

**OTHER AUTHORITIES:**

W. Va. Dep't of Envtl. Protection, Consent Order No. 8951, Issued to Mountain Valley Pipeline, LLC (Apr. 19, 2019), *available at* https://elibrary.ferc.gov/eLibrary/filelist?accession_number=20220310 -5170 ...............................................................14, 15, 16, 22, 24, 31, 33

W. Va. Dep't of Envtl. Protection, Consent Order No. 9925, Issued to Mountain Valley Pipeline, LLC (Dec. 17, 2020), *available at* https://elibrary.ferc.gov/eLibrary/filelist?accession_number=20220310 -5171 ...................................................................15, 16, 22, 24, 31, 33

## **INTRODUCTION**

"West Virginia has long resisted the requirements of the Clean Water Act." *Ohio Valley Envtl. Coalition v. Pruitt*, 893 F.3d 225, 227 (4th Cir. 2018). For example, rather than defend its flawed 2017 Clean Water Act ("CWA") Section 401 certification issued to Mountain Valley Pipeline, LLC ("MVP"), for the Mountain Valley Pipeline project (the "Pipeline"), West Virginia first obtained voluntary remand with vacatur, then waived its certification authority. To obtain remand, West Virginia confessed "that the information used to issue the Section 401 Certification needs to be further evaluated and possibly enhanced and that it needs to reconsider its antidegradation analysis[.]" *Sierra Club v. U.S. Army Corps of Eng'rs* ("*Sierra Club I*"), 909 F.3d 635, 641 (4th Cir. 2018) (cleaned up). On remand, West Virginia *did not* reconsider its antidegradation analysis per its commitment to this Court, but instead abdicated its CWA §401 responsibilities by waiving its authority to certify the relevant permits. *Id.*

West Virginia's resistance to the CWA's requirements continues with the action at issue here: the December 30, 2021 CWA §401 certification (the "Certification") of the individual CWA §404 permit that MVP seeks from the United States Army Corps of Engineers ("Corps") for the Pipeline's waterbody crossings. CERT_000001-12 (JA0001-12). The West Virginia Department of Environmental

Protection ("WVDEP") has once more failed to ensure protection of West Virginia's water quality standards, resulting in an arbitrary and capricious decision.

## STATEMENT OF SUBJECT MATTER AND APPELLATE JURISDICTION

On December 30, 2021, WVDEP issued a CWA §401 certification for the Pipeline. CERT_000001-12 (JA0001-12). On January 3, 2022, Petitioners filed a timely petition for review of the Certification. ECF #3.

The Pipeline is subject to Section 7 of the Natural Gas Act ("NGA"), 15 U.S.C. §717f, and is being constructed in this Circuit. *Sierra Club v. U.S. Army Corps of Eng'rs* ("*Sierra Club II*"), 981 F.3d 251, 260 n.6 (4th Cir. 2020). The Certification is a state agency approval required under Federal law. 33 U.S.C. §1341 (AD006-08). Accordingly, this Court has jurisdiction under NGA Section 19(d)(1). 15 U.S.C. §717r(d)(1) (AD004).

Petitioners have standing under Article III of the United States Constitution. For Article III standing, a petitioner must establish (1) injury-in-fact, (2) traceability, and (3) redressability. *Am. Canoe Ass'n v. Murphy Farms, Inc.*, 326 F.3d 505, 517 (4th Cir. 2003). An organization has representational standing when (1) at least one of its members would have standing in his own right, (2) the organization's purpose is germane to the interests it seeks to protect, and (3) there is no need for direct participation by the individual members in the action. *Id.* To establish injury-in-fact

in the environmental context, a petitioner "need only show that he used the affected area, and that he is an individual for whom the aesthetic and recreational values of the area are lessened" by the challenged activity. *Piney Run Pres. Ass'n v. Cty. Comm'rs of Carroll Cty., MD*, 268 F.3d 255, 263 (4th Cir. 2002) (cleaned up).

The addendum to this brief includes the Declarations of Thomas Bouldin, Suzanne Vance, Paula Mann, Herman Mann, Naomi Cohen, and Birch Graves. Those declarations from Petitioners' members establish judicially cognizable harms to their aesthetic, recreational, and property interests threatened by the Pipeline.

Bouldin lives in Summers County, West Virginia. Bouldin Decl., ¶1 (AD052). Hungard Creek forms the western boundary of his property. *Id.*, ¶6 (AD053). MVP intends to construct thirteen open-cut, dry-ditch crossings in the Hungard Creek watershed. *Id.*, ¶16 (AD054-5). Each of those crossings would be upstream of Bouldin's property. *Id.* "The threat of those crossings being constructed has diminished [Bouldin's] enjoyment of living along Hungard Creek, and if they are actually constructed, [his] enjoyment will be even further diminished." *Id.*

Vance owns a farm in Lewis County, West Virginia, along Oil Creek of Little Kanawha River. Vance Decl., ¶¶1, 4 (AD057). Second Big Run, a tributary of Oil Creek, originates just northeast of her property and flows onto and across her farm. *Id.*, ¶4. MVP plans to construct two open-cut, dry-ditch crossings of Second Big Run's tributaries a short distance from where the stream flows onto Vance's property.

*Id.*, ¶17 (AD060). Construction of those crossings threatens harm to Vance's aesthetic enjoyment of the stream. *Id.*, ¶19 (AD061).

Paula and Herman Mann live in Monroe County, West Virginia. Paula Mann Decl., ¶1 (AD063); Herman Mann Decl., ¶1 (AD068). MVP plans to trench through Slate Run of Hans Creek, the Narrows of Hans Creek, and Indian Creek in Monroe County to construct the Pipeline. Paula Mann Decl., ¶¶10, 14, and 20 (AD064-66). The Manns' farm lies along Slate Run, downstream of MVP's proposed crossing. *Id.*, ¶10 (AD064). Paula Mann's enjoyment of photographing aquatic life in Slate Run has been diminished by the threat of impacts from the proposed upstream Pipeline crossing. *Id.*, ¶¶11-12 (AD064-65). The Manns also frequently recreate along and enjoy the Narrows of Hans Creek and Indian Creek, but their concerns about Pipeline construction diminish their enjoyment of those streams. Paula Mann Decl., ¶¶13-24 (AD065-66); Herman Mann Decl., ¶¶9-15 (AD069-70). If the Pipeline is completed, the Manns plan to leave the farm on which Paula Mann has spent her entire life. Paula Mann Decl., ¶9 (AD064); Herman Mann Decl., ¶8 (AD069).

Cohen is a long-time Monroe County, West Virginia, resident. Cohen Decl., ¶1 (AD071). Pipeline construction diminishes Cohen's enjoyment of scenic drives in Monroe County, and threatens the water source she uses for drinking and cooking at her home. *Id.*, ¶¶11-13 (AD073).

Graves has a lifelong connection to Indian Creek in Monroe County, West Virginia. Graves Decl., ¶¶1, 3 (AD075). Permitting MVP to construct its multiple planned crossings in the Indian Creek watershed would diminish Graves's enjoyment of Indian Creek. *Id.*, ¶¶6-7 (AD076).

The above-described injuries are fairly traceable to the Certification. Without the Certification, MVP cannot trench through streams owned or used by Petitioners' members. Bouldin Decl., ¶24 (AD056); Vance Decl., ¶¶16-17 (AD060); Paula Mann Decl., ¶26 (AD066); Herman Mann Decl., ¶16 (AD070); Cohen Decl., ¶14 (AD073-74); Graves Decl., ¶8 (AD076). Moreover, judicial relief would redress those injuries. Bouldin Decl., ¶25 (AD056); Vance Decl., ¶25 (AD061); Paula Mann Decl., ¶27 (AD066); Herman Mann Decl., ¶17 (AD070); Cohen Decl., ¶15 (AD074); Graves Decl., ¶9 (AD076); *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 572 n.7 (1992).

Because their members have standing, Petitioners have organizational standing. Their members' interests in protecting West Virginia's waters and land are germane to their organizational purposes. *See, e.g.*, Paula Mann Decl., ¶¶2-5 (AD063-64); Cohen Decl., ¶2 (AD071); Graves Decl., ¶2 (AD075). Moreover, the members' individual participation is unnecessary because this case seeks *vacatur* of agency action, not individualized relief. Accordingly, Petitioners have standing, and this Court has jurisdiction.

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

1.   Whether WVDEP's Certification issuance was arbitrary and capricious because:

   a.   WVDEP's internally contradictory explanation implausibly relied on an expectation of MVP's future permit compliance to find a reasonable assurance that MVP's waterbody crossings will not violate water quality standards, while simultaneously dismissing MVP's similar past violations as unsurprising; and

   b.   WVDEP applied the wrong legal standard by focusing on the severity of MVP's documented water quality standards violations, rather than their existence.

2.   Whether WVDEP's Certification issuance violated CWA §401(d) because WVDEP failed to include a Certification condition requiring MVP to comply with certain permits and plans after the agency determined that such compliance was necessary to ensure compliance with water quality standards.

3.   Whether WVDEP's Certification issuance ran counter to the record due to WVDEP's erroneous determination that MVP's stream-crossing plans are consistent with the agency's *Erosion and Sediment Control Best Management Practice Manual*.

4.   Whether WVDEP's Certification issuance ran counter to the record due to WVDEP's erroneous belief that the Environmental Protection Agency ("EPA") had

endorsed stormwater BMPs to protect water quality standards during instream construction.

5.    Whether WVDEP's Certification issuance was arbitrary and capricious because WVDEP unreasonably and unlawfully relied on surrogate processes and demonstrably incorrect excuses to avoid performing required location-specific antidegradation reviews.

## STATEMENT OF THE CASE

### *Nature of the Case*

Pursuant to NGA Section 19(d)(1), 15 U.S.C. §717r(d)(1) (AD004), this petition seeks review of WVDEP's CWA §401 certification that discharges related to MVP's proposed open-cut, dry-ditch crossings of hundreds of streams and wetlands in West Virginia will not violate water quality standards.

### *Legal Framework*

Under CWA §401, federal permits—such as individual §404 permits issued by the Corps—require certification from affected states that permitted activities will comply with water quality standards. 33 U.S.C. §1341(a)(1) (AD006-07). Under EPA regulations, to issue §401 certifications states must conclude "that there is a reasonable assurance that the activity will be conducted in a manner which will not

violate applicable water quality standards." 40 C.F.R. §121.2(a)(3) (2019) (AD010).[1]

"Water quality standards are a critical component of the CWA regulatory scheme[.]" *Natural Res. Defense Council v. U.S. E.P.A.*, 16 F.3d 1395, 1399 (4th Cir. 1993). EPA recognizes that "the CWA requires strict compliance with water quality standards," *i.e.*, they "are legally required to be met [at] all times." 49 Fed. Reg. 37,998, 38,038 (Sept. 26, 1984).[2] Water quality standards consists of:

> (1) one or more designated uses of the state waters involved; (2) certain water quality criteria, expressed as numeric pollutant concentration levels or narrative statements representing a quality of water that supports a particular designated use; and (3) an antidegradation policy to protect existing uses and high quality waters.

*Natural Res. Defense Council*, 16 F.3d at 1400 (citing 33 U.S.C. §1313(c)(2)(A) and 40 C.F.R. §131). The water quality standards at issue here include West Virginia's narrative water quality criteria and antidegradation policy. W. Va. C.S.R. §§47-2-3.2, -4. (AD013, AD015-16); *id.* §60-5-1 *et seq.* (AD032-50).

---

1   EPA's reasonable interpretations of §401 warrant deference. *PUD No. 1 of Jefferson Cty. v. Wash. Dep't of Ecology*, 511 U.S. 700, 712 (1994). The 2019 regulation applies here because EPA's 2020 §401 regulations have been vacated. *In re Clean Water Act Rulemaking*, ___ F.Supp.3d ___, 2021 WL 4924844 (N.D. Cal. Oct. 21, 2021); CERT_000002 (JA0002).

2   Congress charged EPA with oversight of state water quality standards. 33 U.S.C. §1313.

West Virginia's narrative water quality criteria prohibit discharges that cause or contribute to, *inter alia*:

> 3.2.a. Distinctly visible floating or settleable solids, suspended solids, scum, foam or oily slicks;
> 3.2.b. Deposits or sludge banks on the bottom;
> *****
> 3.2.e. Materials in concentrations which are harmful, hazardous or toxic to man, animal or aquatic life;
> *****
> 3.2.i. Any other condition … which adversely alters the integrity of the waters of the State, including wetlands; no significant adverse impact to the chemical, physical, hydrologic, or biological components of aquatic ecosystems shall be allowed.

*Id.* §47-2-3.2.a-b, -3.2.e, & -3.2.i (AD013).[3] West Virginia describes those as "conditions not allowable." *Id.* §47-2-3. Narrative water quality standards like West Virginia's "conditions not allowable" are both essential and enforceable. *Natural Res. Def. Council*, 16 F.3d at 1405; *see also PUD No. 1 of Jefferson County v. Wash. Dep't of Ecology*, 511 U.S. 700, 716 (1994) (explaining the CWA allows "enforcement of broad, narrative criteria").

West Virginia's antidegradation policy is codified at W. Va. C.S.R. §47-2-4 (AD015-16). It assigns three tiers of protection to West Virginia's waters, depending

---

3 Although one of West Virginia's narrative water quality criteria incorporates a "significant adverse impact" requirement, eight others do not (W. Va. C.S.R. §47-2-3.2 (AD013))—including those MVP has repeatedly violated (*infra,* p. 16). The inclusion of language in one criterion, but its omission from the others, indicates "the omission was deliberate." *Jones v. C.I.R.*, 642 F.3d 459, 463 (4th Cir. 2011).

on their existing quality and national significance: Tier 1, Tier 2, and Tier 3. *Id.* §47-2-4.1. Existing uses must be maintained in Tier 1 waters; the existing high-quality of Tier 2 waters must be protected absent socio-economic justification through an alternatives analysis; and the degradation of outstanding national resource waters in Tier 3 streams is prohibited. *Id.*

West Virginia's antidegradation implementation procedures are codified at W. Va. C.S.R. §60-5-1 *et seq.* (AD032-50). An antidegradation review requires WVDEP to determine (1) the existing uses of waterbodies associated with the proposed activity, (2) the baseline water quality for those waterbodies, and (3) the protection "tier" applicable to the waterbodies. W. Va. C.S.R. §60-5-3.3 to -3.5 (AD035-36).

Moreover, like the North Carolina program addressed in *Mountain Valley Pipeline, LLC v. North Carolina Department of Environmental Quality*, 990 F.3d 818 (4th Cir. 2021), West Virginia's CWA §401 program requires an alternatives analysis to avoid and minimize impacts. W. Va. C.S.R. §47-5A-4.2 (AD021). To implement that regulation, WVDEP's §401 certification application requires submission of a "No Practical Alternative Demonstration." APP_000013 (JA0091). WVDEP's instructions require applicants to

> [s]ubmit a *conclusive* demonstration to justify the proposed activity (ies). If more than one activity is involved in the project (fills, culverting, stream relocations, etc.), justify the need for *each activity* by providing the following:

— 10 —

- Show that other alternatives were considered and why they were eliminated.

- Show that the activity will impact Waters of the U.S. *no more than is necessary* to accommodate its proper construction and operations.

W. Va. Dep't of Envtl. Protection, Water Quality State 401 Certification Application Instructions at 3 ("Application Instructions") (emphasis added) (AD080). States have broad authority to impose requirements in CWA permit applications, and this Court gives them meaning and effect. *Southern Appalachian Mountain Stewards v. A&G Coal Corp.*, 758 F.3d 560, 564, 566-69 (4th Cir. 2014).

### Statement of Facts

#### *MVP's Initial Efforts to Permit Waterbody Crossings*

MVP proposes to build a 42-inch-diameter Pipeline through West Virginia and Virginia. *Sierra Club II*, 981 F.3d at 255. Although WVDEP touts Pipeline construction as (in its view) "substantially complete," a significant number of stream and wetland crossings remain to be completed—including hundreds in West Virginia. CERT_000003 (JA0003). Indeed, the 197-mile Pipeline route in West Virginia remains perforated in 193 locations by incomplete waterbody crossings. *Id.*; Table 15 (Crossing Method Determination Summary, Individual Permit Application, Mountain Valley Pipeline Project) at 1-22 ("Table 15") (JA1470-91).

Pipeline waterbody crossings can be constructed in one of two ways: either by trenching *through* the waterbody using an open-cut crossing (which requires a CWA §404 permit), or by boring *under* the waterbody using a trenchless crossing (which generally does not). REL_001046 (JA1282). MVP initially intended to use open-cut, dry-ditch methods to construct the Pipeline through the waterbodies in its path, rather than using trenchless methods. REL_000147-49 (JA1283-85). Open-cut, dry-ditch crossing methods require dewatering the streambed. REL_000147-48 (JA1283-84). After dry working conditions are established, MVP would excavate a trench through the streambed at least 4.5 feet wide and 9 (or more) feet deep. REL_000142 (JA1278). Some stream crossings would require in-stream blasting, which could "injure or kill aquatic organisms during blast-hole drilling operations, and temporarily increase stream turbidity." REL_000422 (JA1295). After placing the Pipeline in the trench, MVP would backfill the trench, attempt to restore the streambed, and allow normal streamflow to resume. REL_000147-48 (JA1283-84). The removal of crossing-construction infrastructure leads to increased downstream sedimentation. *See, e.g.*, CERT_000065 (JA0024).

Because open-cut, dry-ditch crossings "involve the discharge of fill material into federal waters, the CWA requires MVP to obtain approval from [the Corps] before beginning construction." *Sierra Club II*, 981 F.3d at 256. MVP initially attempted to satisfy that requirement by obtaining authorization to discharge fill

— 12 —

material under Nationwide Permit ("NWP") 12. *See generally Sierra Club I*, 909 F.3d at 639-43. MVP obtained Corps verifications that its stream-crossing activities were authorized by NWP 12 in late 2017. *Id.* at 641. But this Court vacated those verifications in late 2018, holding that MVP could not satisfy certain NWP 12 conditions in West Virginia and observing that "an individual permit [under §404] will likely be necessary." *Id.* at 655.

One condition MVP could not satisfy was the requirement that large-diameter pipelines possess an individual §401 certification. *Id.* at 651-54. WVDEP had issued MVP a §401 certification in March 2017, but sought voluntary remand with vacatur of that action after it was challenged in this Court. *Id.* at 641. WVDEP represented to this Court that "'the information used to issue the Section 401 Certification needs to be further evaluated and possibly enhanced' and that it 'needs to reconsider its antidegradation analysis in the Section 401 Certification.'" *Id.* (quoting *Sierra Club v. W. Va. Dep't of Envtl. Prot.*, No. 17-1714, ECF #42 (4th Cir. Sept. 13, 2017)).

On remand, rather than reevaluating the information on which it based its action or reconsidering its antidegradation analysis, WVDEP waived its authority to certify MVP's NWP 12 verification. *Id.* As a result, MVP could not satisfy West Virginia's NWP 12 condition requiring individual §401 certification. *Id.*

To publicly justify its waiver, WVDEP relied on its belief that it could effectively regulate the Pipeline through its Oil and Gas Construction

Stormwater Permit ("Stormwater Permit"). *See* Secretary Caperton's Letter to WVDEP Staff Regarding the Mountain Valley Pipeline (Nov. 13, 2017), available at https://dep.wv.gov/news/Pages/Secretary-Caperton%27s-Letter-to-WVDEP-Staff-Regarding-the-Mountain-Valley-Pipeline.aspx. WVDEP authorized MVP to discharge construction stormwater under that state-law permit in July 2017. REL_002155-56 (JA2120-21). But WVDEP subsequently documented almost 140 violations of the Stormwater Permit by MVP, demonstrating that WVDEP's reliance on that permit was misplaced.

*MVP's Documented Water Quality Standards and Permit Violations*

While its NWP 12 verifications were in effect, "MVP completed open-cut crossings of approximately 23 streams and nine wetlands in West Virginia." CERT_000009 (JA0009). WVDEP inspectors found "several … violations … at the stream crossings where MVP conducted work." *Id.*

Based on those violations, and Stormwater Permit violations that MVP committed in its upland work before the Federal Energy Regulatory Commission ("FERC") stopped all Pipeline construction in October 2019, WVDEP brought two administrative enforcement actions against MVP, resulting in two Consent Orders. *See, e.g.*, COMM_000518 (JA1059); *see also* W. Va. Dep't of Envtl. Protection, Consent Order No. 8951, Issued to Mountain Valley Pipeline, LLC (Apr. 19, 2019) ("2019 Consent Order"), *available at* https://elibrary.ferc.gov/eLibrary/filelist?

— 14 —

accession_number=20220310-5170; W. Va. Dep't of Envtl. Protection, Consent Order No. 9925, Issued to Mountain Valley Pipeline, LLC (Dec. 17, 2020) ("2020 Consent Order"), *available at* https://elibrary.ferc.gov/eLibrary/filelist?accession_number=20220310-5171.[4]

In both Consent Orders, WVDEP found two types of violations. ***First,*** WVDEP found that MVP violated provisions of the Stormwater Permit. *See* 2019 Consent Order at 1-11; 2020 Consent Order at 1-13. For example:

> On September 11, 2018, WVDEP personnel conducted an inspection of the facility. During the inspection, a violation of the following section of the permit was observed and documented:
> a. Section G.4.e.2.A.ii.j – MVP failed to prevent sediment-laden water from leaving the site without going through an appropriate device at Station 900 where concentrated flow over-topped installed perimeter controls.

2019 Consent Order, Finding of Fact 15.

***Second,*** WVDEP expressly found that MVP caused violations of the water quality standards codified in the West Virginia Legislative Rules at W. Va. C.S.R.

---

4  WVDEP did not include its Consent Orders in the administrative record for this petition for review, despite having dismissed the violations reflected in them as unsurprising and insignificant in the Certification. *See* Section I, *infra.* Petitioners request that the Court take judicial notice of the two Consent Orders. *See Sierra Club v. U.S. Dep't of the Interior*, 899 F.3d 260, 276 n.4 (4th Cir. 2018) (taking judicial notice of official agency actions); *Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am. v. Zantop Air Transp. Corp.*, 394 F.2d 36, 40 (6th Cir. 1968) (compiling cases recognizing appropriateness of taking judicial notice of administrative orders).

§47-2-3.2 (AD013). WVDEP identified water quality standards violations with reference to the specific legislative rule and narrative water quality standard at issue, and denoted multiple violations discovered on the same inspection in the same subparagraph. For example:

> On August 1 and 6, 2018, WVDEP personnel conducted an inspection of the facility. During the inspection, violations of the following sections of WV Legislative Rules … were observed and documented:
> *****
> e. 47CSR2 Section 3.2.a – MVP caused conditions not allowable in waters of the State by creating distinctly visible settleable solids in the following three (3) locations: the Right Fork of Big Elk Creek …, Goose Run …, and the [Unnamed Tributary] of Goose Run ….
> f. 47CSR2 Section 3.2.b – MVP caused conditions not allowable in waters of the State by allowing sediment deposits in the following three (3) locations: the UNT of Goose Run …, Seal Run …, and Grass Run ….

2019 Consent Order, Finding of Fact 9.

In the 2019 Consent Order, WVDEP assessed a $265,972 civil penalty against MVP for 64 permit violations and 37 narrative water quality standards violations. *Id.* at 1-11. In the 2020 Consent Order, WVDEP assessed a $303,706 civil penalty against MVP for 75 permit violations and at least nine narrative water quality standards violations. 2020 Consent Order at 1-14.

*MVP's Most Recent Efforts to Permit Waterbody Crossings*

In September, 2020, after WVDEP and the Corps attempted to change the NWP 12 conditions that rendered MVP ineligible for that permit, the Corps once

— 16 —

again issued verifications of MVP's authorization to construct stream crossings under NWP 12. *See generally Sierra Club II*, 981 F.3d at 254-63. This Court stayed MVP's reissued NWP 12 verifications on November 9, 2020. Order, *Sierra Club v. U.S. Army Corps of Eng'rs*, No. 20-2039(L), ECF #50 (4th Cir. Nov. 9, 2020).

In response to the November 9, 2020 stay, MVP for the first time began seriously considering more widespread use of trenchless crossing methods, which generally do not require §404 authorization. "[T]renchless methods are the least destructive approach for pipeline crossings of waterbodies absent special site-specific conditions." Starr Silvis, M.S., P.E., *Review of Mountain Valley Pipeline, LLC's Application for an Individual Section 404 Permit from the U.S. Army Corps of Engineers* 1 (May 27, 2021) (JA0914); *see also* W. Va. Dep't of Envtl. Protection, Division of Water & Waste Management, *Erosion and Sediment Control Best Management Practice Manual* 3.21-2 (2006, rev. Aug. 29, 2016) ("BMP Manual") (AD120) (prescribing trenchless methods as "the least destructive and preferred method" for utility-line stream crossings).

Just nine days after this Court stayed MVP's 2020 NWP 12 authorizations, MVP asked FERC to amend its NGA Certificate of Public Convenience and Necessity to allow MVP to use trenchless technologies to bore under every waterbody along the first 77 miles of its route. *See generally* Abbreviated Application of Mountain Valley Pipeline, LLC for Limited Amendment to

Certificate of Public Convenience and Necessity and Request for Expedited Action ("November 2020 FERC Application") (JA0976-92). Specifically, MVP proposed to bore under 69 waterbodies at 41 locations. *Id.* at 1 (JA0976). MVP sought this change to try to complete the first 77 miles of the Pipeline and begin interim service to an interconnection with another interstate natural gas pipeline at Milepost 77.6. *Id*. MVP identified this Court's November 9, 2020 stay as the reason for its proposal. Mountain Valley Pipeline, *Supplemental Environmental Report for Proposed Conventional Bore Waterbody and Wetland Crossings from Mileposts 0 to 77* at 1-1 (Nov. 2020) ("November 2020 Supp. Envtl. Rpt.") (JA0997).

Specifically, MVP proposed using a "conventional bore," November 2020 Supp. Envtl. Rpt. at 1-2 (JA0998), sometimes referred to as "boring and jacking" or "jack and bore." *Compare* BMP Manual 3.21-2 (AD120), *with* Mountain Valley Pipeline, LLC, Waterbody Crossing Review at 4 (Apr. 2016) ("Waterbody Crossing Review") (JA0961). Using that method, MVP would dig "bore pits" on each side of the waterbody, from which it would bore a tunnel and install the Pipeline under the waterbody. November 2020 Supp. Envtl. Rpt. at 1-3 (JA0999). MVP admitted the technique would reduce adverse impacts on waterbodies. November 2020 FERC Application at 11 (JA0986).

MVP certified to FERC that "[t]he crossing lengths, bore geometry, terrain, and bore pit logistics for the crossings at issue in this [application] are well suited

— 18 —

for conventional bores." November 2020 Supp. Envtl. Rpt. at 1-2 (JA0998). MVP also certified to FERC that bore failures at these crossings were "unlikely." November 2020 FERC Application at 7 (JA0982).

On December 1, 2020—before FERC acted on MVP's November 2020 application to bore under the waterbodies along the first 77 miles of the Pipeline— this Court published a per curiam opinion explaining why it stayed MVP's 2020 NWP 12 authorizations. *Sierra Club II*, 981 F.3d at 254-65. Thereafter, MVP altered its plans once more. The company decided to seek an individual CWA §404 permit from the Corps to construct open-cut crossings at the majority of its waterbody crossings, and to submit yet another certificate amendment to FERC seeking to bore under yet another set of streams and wetlands. REL_000931-33 (JA1321-23). MVP's new plan entailed asking the Corps to revoke the 2020 NWP 12 verifications and withdrawing the November 2020 FERC Application. *Id.*

Notably, when MVP submitted its new trenchless-crossing application to FERC on February 19, 2021, it no longer sought to bore under every waterbody along the first 77-miles of the route. Indeed, the February 2021 application only sought to implement three of the 41 trenchless crossings proposed in the November 2020 FERC Application. *Compare* November 2020 Supp. Envtl. Rpt., tbl. A-1 (JA1019-20) *with* Mountain Valley Pipeline, *Supplemental Environmental Report*

*for Proposed Certificate Amendment for Avoidance of Waters of the United States*, tbl. A-1 (Feb. 2021) (JA1326-28).

Contemporaneously with its February 2021 applications to the Corps and FERC, MVP applied to WVDEP for a CWA §401 certification for its individual CWA §404 permit. APP_000001-47 (JA0079-125). In that application, MVP abruptly changed its position on trenchless crossing feasibility along the first 77 miles of the route, now certifying to WVDEP that trenchless crossings are impracticable for 38 of the 41 crossings it had previously certified to FERC were "well-suited" for conventional bores. Table 15 at 1-5 (JA1470-74).

WVDEP solicited public comment on MVP's §401 certification application. CERT_000003 (JA0003). Petitioners submitted voluminous comments. COMM_000090-266 (JA0737-913); COMM_000404-424 (JA1021-41); COMM_000715-37 (JA1073-95). Among the issues Petitioners raised were (1) that MVP's history of water quality standards violations precluded WVDEP from finding that MVP will not violate water quality standards going forward,[5] and (2) that, because of MVP's long history of conflicting statements about the feasibility of

---

5 COMM_000154-56, COMM_000205-06 (JA0801-03, JA0852-53); COMM_000420-21 (JA1037-38); COMM_000715-18, COMM_000722-36 (JA1073-76, JA1080-94).

trenchless crossings, MVP has no credibility on its assertions that its proposed open-cut crossings are the least environmentally damaging practicable alternative.[6]

On December 30, 2021, WVDEP granted the Certification to MVP, determining that "there is a reasonable assurance that the activity will be conducted in a manner which does not violate water quality standards." CERT_000002 (JA0002). WVDEP's determination rests heavily on its erroneous belief that MVP will comply with WVDEP's BMP Manual, which prescribes best management practices ("BMPs") for instream construction. BMP Manual, §3.21 (AD119-45). Two requirements of the BMP Manual's Instream BMPs are relevant here: (1) the Construction Criteria specify that boring under a stream is the "least damaging and preferred method," and (2) the General Design Criteria require that the drainage area upstream from a crossing "be no greater than one square mile." *Id.* at 3.21-3, -4 (AD121, AD122).

Although WVDEP included 31 conditions in the Certification, WVDEP did not make MVP's compliance with the Stormwater Permit a Certification condition, despite WVDEP's reliance on compliance with that permit to protect water quality. *Compare* CERT_000014-19 (JA014-19) *with* CERT_000213 (JA0056).

---

6 COMM_000104-16 (JA0751-63); COMM_000421-23 (JA1037-38); COMM_000736 (JA1094).

## SUMMARY OF THE ARGUMENT

WVDEP unsuccessfully tried to disguise its Certification to resemble Virginia's judicially-approved §401 certification of MVP's upland activities at issue in *Sierra Club v. State Water Control Board* ("*SWCB*"), 898 F.3d 383 (4th Cir. 2018). *Compare, e.g.*, CERT_000213 (JA0056) ("Without information demonstrating otherwise the WVDEP relies on compliance with the requirements of the [Stormwater Permit] to control discharges from construction activities as necessary to meet the applicable water quality standards and antidegradation requirements."), *with SWCB*, 898 F.3d at 398 ("'In the absence of information demonstrating otherwise, compliance with the requirements under the [AS&S] Program will result in stormwater discharges being controlled as necessary to meet applicable water quality standards and antidegradation requirements.'" (modification in *SWCB*; quoting Virginia's administrative record)). But this case is not *SWCB*, legally or factually.

- In *SWCB*, because MVP was a new company and had not yet begun pipeline construction, Virginia's agencies were writing on a blank slate and the exercise was "inherently predictive." *SWCB*, 898 F.3d at 397. Here, WVDEP claimed to be reasonably assured of water quality standards protection against a backdrop of MVP's widespread water quality standards violations. *See generally* 2019 Consent Order; 2020 Consent Order.

- In *SWCB*, the §401 certification required MVP to comply with the BMPs on which Virginia's agencies relied to ensure compliance with Virginia's water quality standards. *SWCB*, 898 F.3d at 396. Here, WVDEP unlawfully failed to include such conditions in the Certification, rendering them potentially unenforceable. CERT_000014-19 (JA0014-19).

- In *SWCB*, there was no allegation that MVP's construction plans were inconsistent with the BMPs on which Virginia relied to ensure compliance with water quality standards. *SWCB*, 898 F.3d at 404. Here, MVP's plans are demonstrably inconsistent with WVDEP's BMP Manual. BMP Manual, §3.21 (AD119-45).

- In *SWCB*, the conditions of the EPA stormwater permit on which Virginia relied were analogous to the upland stormwater BMPs Virginia imposed. *SWCB*, 898 F.3d at 404. Here, the instream construction techniques at issue are not regulated by the EPA stormwater permit. REL_002069, REL002072-75 (JA2107, JA2108-11).

- In *SWCB*, the Court found Virginia's surrogates for location-specific antidegradation review to be reasonable and consistent with Virginia law. *SWCB*, 898 F.3d at 404-05. Here, WVDEP's surrogates for such review were unreasonable and inconsistent with West Virginia law. *See, e.g.*, W. Va. C.S.R. §47-2-4.1.b, §60-5-1.5.b, §60-5-1.5.d (AD015, AD032).

Because of the foregoing, *SWCB* does not control the result here. Whether WVDEP's December 30, 2021 Certification was arbitrary and capricious should be assessed on the specific legal questions and factual context presented. For the following reasons, WVDEP's action was arbitrary, capricious, and otherwise not in accordance with law, and this Court should vacate the Certification. 5 U.S.C. §706(2)(A).

1.    WVDEP's finding, pursuant to 40 C.F.R. §121.2(a)(3) (2019) (AD010), "that there is a reasonable assurance that the activity will be conducted in a manner which will not violate applicable water quality standards" was arbitrary and capricious because it was entirely implausible, internally inconsistent, and applied the wrong legal standard. WVDEP "relie[d] on compliance with the requirements of the [Stormwater Permit] to control discharges from construction activities as necessary to meet the applicable water quality standards." CERT_000213 (JA0056). But WVDEP did so despite its own findings that MVP had violated the Stormwater Permit 139 times and committed dozens of water quality standards violations. 2019 Consent Order at 1-11; 2020 Consent Order at 1-13. In response to MVP's violation history, WVDEP nonchalantly stated that, given the project's nature, it "does not regard the number of violations its inspectors issued as surprising." CERT_000226 (JA0069). Because WVDEP simultaneously expects *both* (1) MVP will violate the Stormwater Permit and water quality standards *and* (2) MVP's compliance with the

Stormwater Permit's requirements will assure compliance with water quality standards, its contradictory explanation of its reasonable assurance finding is implausible. *Defs. of Wildlife v. U.S. Dep't of Interior*, 931 F.3d 339, 365 (4th Cir. 2019); *ANR Storage Co. v. FERC*, 904 F.3d 1020, 1028 (D.C. Cir. 2018).

Moreover, WVDEP arbitrarily and capriciously applied the incorrect legal standard to MVP's violation history. *Wild Virginia v. U.S. Forest Serv.*, 24 F.4th 915, 931 (4th Cir. 2022). WVDEP dismissed MVP's water quality standards violations as "minor" because "none alleged any significant adverse impacts to the aquatic ecosystems[.]" CERT_000009, CERT_000226 (JA0009, JA0069). But "the CWA requires strict compliance with water quality standards," *i.e.*, they "are legally required to be met [at] all times." 49 Fed. Reg. at 38,038. Accordingly, WVDEP applied the wrong legal standard by focusing on the *severity* of MVP's water quality standards violations, rather than their existence, when making its reasonable assurance finding.

2.    Where a "state concludes that conditions on the operation of the project are necessary to ensure compliance with its water quality standards, those conditions must be set out in the §401 certification." *N.C. Dep't of Envtl. Quality v. FERC*, 3 F.4th 655, 661 (4th Cir. 2021). Here, WVDEP concluded that "MVP must comply with the [Stormwater Permit], implement the proposed [Stormwater Pollution Prevention Plan ("SWPPP")], *and* comply with Certification conditions to control

potential sediment discharges from the Project to ensure appropriate protection of aquatic resources, water quality, and prevent degradation of State waters." CERT_000231 (JA0074) (emphasis added). Yet WVDEP failed to make Stormwater Permit and SWPPP compliance a Certification condition. CERT_000014-19 (JA0014-19). That failure violates §401(d). *N.C. Dep't of Envtl. Quality*, 3 F.4th at 661.

3.    WVDEP's reliance on its unsupported determination that MVP's stream-crossing plans are "consistent with WVDEP's BMP Manual," CERT_000007, CERT_000223 (JA0007, JA0066), is arbitrary and capricious because it runs counter to the record. *Sierra Club v. U.S. Forest Serv.*, 897 F.3d 582, 594 (4th Cir. 2018). MVP's proposed crossing methods fail to meet the BMP Manual's requirements in two important ways. ***First***, MVP's plans are inconsistent with the BMP Manual's preference for less-damaging trenchless crossing methods, BMP Manual at 3.21-2, -4 (AD120, AD122), and WVDEP's acquiescence to MVP's claims that such methods are impracticable at most of its crossings was arbitrary and capricious. WVDEP entirely failed to address MVP's prior sworn statements that 38 locations where it now claims trenchless crossings are impracticable were, in fact, "well suited" for such methods. *Friends of Buckingham v. State Air Pollution Control Bd.*, 947 F.3d 68, 87-90 (4th Cir. 2020); *U.S. Forest Serv.*, 897 F.3d at 594. ***Second,*** MVP's plans are inconsistent with the BMP Manual's limit on drainage-

— 26 —

area size above open-cut crossings to one square mile or less. BMP Manual at 3.21-3 (AD121). WVDEP did not evaluate the drainage areas of MVP's proposed open-cut crossings. Had it done so, it would have discovered numerous crossings proposed at locations where upstream drainage areas exceed one mile. *See* Table 1, *infra*.

4.    WVDEP's mistaken belief that EPA's construction stormwater permit supports a finding that BMPs used during *instream* construction will protect water quality standards runs counter to the record. *U.S. Forest Serv.*, 897 F.3d at 594. The EPA permit on which WVDEP relies applies to management of stormwater runoff during construction on land. REL_002069 (JA2107). It does not—and cannot—regulate the instream §404 discharges at issue here. *Coeur Alaska, Inc. v. Southeast Alaska Conservation Council*, 557 U.S. 261, 273-74 (2009). Accordingly, WVDEP's reliance on EPA's permit was arbitrary and capricious.

5.    WVDEP's refusal to conduct the required location-specific antidegradation review was arbitrary and capricious. W. Va. C.S.R. §60-5-5.6.c (AD040); *Ohio Valley Envtl. Coalition v. Horinko*, 279 F.Supp.2d 732, 761-62 (S.D. W. Va. 2003). Some of WVDEP's excuses for its failure to perform that review—its reliance on the Stormwater Permit and BMP Manual—are arbitrary and capricious for the reasons described above.

Other excuses offered by WVDEP conflict with West Virginia's antidegradation program. *First,* West Virginia's antidegradation program allows the use of BMPs as a surrogate for antidegradation review of *nonpoint sources*, W. Va. C.S.R. §60-5-1.5.b (AD032), but more—including location-specific review—is required for §404 *point-source discharges* like those at issue here. *Id.* §47-2-4.1.b (AD015); §60-5-3.8 (AD036). *Second*, WVDEP misconstrues W. Va. C.S.R. §60-5-1.5.d (AD032) to allow it to substitute other regulatory processes for a substantive antidegradation review, instead of merely relying on those reviews and processes to provide *information* necessary for antidegradation review. *Id. Finally,* WVDEP asserted (1) that antidegradation review of §404 discharges is not required, (2) that baseline data would not be valuable, and (3) that predictions of sedimentation from open-cut stream crossings cannot be made, or are not valuable. Those three excuses are contrary to the law and the evidence.

## ARGUMENT

### *Standard of Review*

In proceedings reviewing §401 certifications under NGA Section 19(d)(1), 15 U.S.C. §717r(d)(1) (AD004), this Court applies the Administrative Procedure Act's standard of review. *SWCB*, 898 F.3d at 403. Under that statute, the Court must set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. §706(2)(A).

To survive arbitrary and capricious review in NGA Section 19(d)(1) proceedings, a state agency must articulate "a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Friends of Buckingham*, 947 F.3d at 83. Reasoned decisionmaking requires agencies to avoid implausible explanations, *Defs. of Wildlife*, 931 F.3d at 365, to avoid internally inconsistent explanations, *ANR Storage*, 904 F.3d at 1028, and to apply correct legal standards, *Wild Virginia*, 24 F.4th at 931; *U.S. Forest Serv.*, 897 F.3d at 604-05. An agency cannot rest its determination even partially on an infirm ground. *Williams Gas Processing-Gulf Coast Co., L.P. v. FERC*, 475 F.3d 319, 329-30 (D.C. Cir. 2006). Agency actions are also arbitrary and capricious when they run counter to the record, fail to address important aspects of the problem, or fail to resolve evidentiary conflicts, *U.S. Forest Serv.*, 897 F.3d at 594; *Friends of Buckingham*, 947 F.3d at 87-90. And an agency action that violates or misapplies an applicable statute or regulation is not in accordance with law. *Sierra Club I*, 909 F.3d at 655.

### Discussion of the Issues

WVDEP's issuance of the Certification was arbitrary, capricious, and otherwise not in accordance with law because of the agency's (1) disregard of MVP's history of noncompliance, (2) failure to include required Certification conditions, (3) erroneous determination of consistency between MVP's stream-crossing plans and WVDEP's BMP Manual, (4) erroneous belief that EPA had

endorsed stormwater BMPs to protect water quality standards during instream construction, and (5) refusal to conduct location-specific antidegradation reviews.

## I. WVDEP ARBITRARILY AND CAPRICIOUSLY DISREGARDED ITS OWN FINDINGS THAT MVP REPEATEDLY VIOLATED THE STORMWATER PERMIT AND WATER QUALITY STANDARDS.

EPA's regulations require that, to issue a §401 certification, a state must find "that there is a reasonable assurance that the activity will be conducted in a manner which will not violate applicable water quality standards." 40 C.F.R. §121.2(a)(3) (2019) (AD010). Although WVDEP made the requisite finding here, its explanation for that determination was arbitrary and capricious because it was entirely implausible, internally inconsistent, and applied the wrong legal standard.

### A. WVDEP's Reasoning Is Implausible And Internally Inconsistent.

WVDEP claims to be reasonably assured that instream pipeline construction "will be conducted in a manner which does not violate water quality standards" because, "[w]ithout information demonstrating otherwise[,] the WVDEP relies on compliance with the requirements of the [Stormwater Permit] to control discharges from construction activities as necessary to meet the applicable water quality

standards[.]" CERT_000002; CERT_000213 (JA0002; JA0056). The problem for WVDEP is that it has documented abundant "information demonstrating otherwise."

In two administrative enforcement actions, WVDEP expressly found that MVP repeatedly violated the Stormwater Permit, leading to nearly 50 water quality standards violations. 2019 Consent Order at 1-11; 2020 Consent Order at 1-13. Indeed, WVDEP concedes in the Certification that its inspectors found "several … violations … at the stream crossings where MVP conducted work." CERT_000009 (JA0009). In response to comments that MVP's noncompliance history "demonstrates that discharges from the Project will not comply with water quality standards," WVDEP nonchalantly explained that, given the project's nature, it "does not regard the number of violations its inspectors issued as surprising." CERT_000226 (JA0069). Stated otherwise, despite its express reliance on an expectation of compliance to support its reasonable assurance determination, WVDEP simultaneously held an expectation of widespread noncompliance.

WVDEP's explanation is impermissibly implausible. *Defs. of Wildlife*, 931 F.3d at 365. The record establishes that WVDEP assumes *both* (1) MVP will violate the Stormwater Permit and water quality standards *and* (2) MVP's compliance with the Stormwater Permit's requirements will assure compliance with water quality standards. Simultaneously holding those two views is not reasoned agency decisionmaking. *See Mayor of Baltimore v. Azar*, 973 F.3d 258, 276 (4th Cir. 2020)

— 31 —

(holding agency "cannot simply state it 'believes' something to be true—against the weight of all the evidence before it"). WVDEP defies logic when it says in one breath that MVP's compliance with the Stormwater Permit will prevent water quality standards violations and in the next that MVP's violations of the Stormwater Permit and water quality standards are unsurprising. That internal inconsistency alone justifies vacatur of the Certification. *ANR Storage*, 904 F.3d at 1028; *see also Nat'l Parks Conservation Ass'n v. E.P.A.*, 788 F.3d 1134, 1141 (9th Cir. 2015) ("[A]n internally inconsistent analysis is arbitrary and capricious.").

WVDEP's reliance on Stormwater Permit compliance to protect water quality standards, in the face of contrary real-world experience, is analogous to the Forest Service's reliance on predictive models to the exclusion of real-world data that this Court found arbitrary and capricious in *Wild Virginia*, 24 F.4th at 928. WVDEP's antidegradation procedures recognize that an applicant's "historic noncompliance with its permit" constitutes a "circumstance[] warrant[ing] … review[.]" W. Va. C.S.R. §60-5-5.6.a.2 (AD039). And, in the face of such a history, it is arbitrary and capricious for an agency to predict compliance without rational explanation. *Animal Legal Def. Fund v. Perdue*, 872 F.3d 602, 620 (D.C. Cir. 2017). In *Perdue*, the agency renewed a license based on the applicant's certification of compliance with

— 32 —

applicable regulations, notwithstanding the agency's knowledge of repeated violations of those regulations. *Id.* at 619-20.

As in *Perdue*, the question here is the "agency's ability to demonstrate that it engaged in reasoned decisionmaking." 872 F.3d at 619. And like the agency in *Perdue*, WVDEP fails that test: It implausibly purported to be assured that MVP's activities would not cause water quality standards violations, CERT_000002 (JA0002), against a backdrop of its own findings that MVP's activities had caused dozens of such violations and that such violations are to be expected. 2019 Consent Order at 1-11; 2020 Consent Order at 1-13; CERT_000226 (JA0069). Consequently, WVDEP's issuance of the Certification was arbitrary and capricious.

WVDEP's documentation of widespread permit and water quality standards violations distinguishes this case from this Court's decision in *SWCB* upholding MVP's Virginia upland §401 certification. At the time Virginia issued that certification, it was operating on a blank slate: MVP was a new company that had yet to engage in any pipeline construction. Virginia's finding of reasonable assurance was thus "inherently predictive." *SWCB*, 898 F.3d at 404. Here, MVP has a documented history of violating both the Stormwater Permit *and* West Virginia's water quality standards. 2019 Consent Order at 1-11; 2020 Consent Order at 1-13. Thus, unlike the agencies in *SWCB*, WVDEP was under a heightened duty to explain its determination that MVP's construction would not violate water quality standards

— 33 —

despite the fact that it has already done so many times on this project. *See Perdue*, 872 F.3d at 619-20.

## B. WVDEP Arbitrarily And Capriciously Applied The Wrong Legal Standard.

Numerous commenters brought MVP's documented water quality standards violations to WVDEP's attention. *See e.g.*, CERT_000226 (JA0069) ("WVDEP received many comments arguing that WVDEP cannot grant §401 certification because MVP's compliance history demonstrates that discharges from the Project will not comply with water quality standards[.]"); COMM_000716-18 (JA1074-76). But WVDEP disregarded the violations because, it its view, the violations were tolerable because "none alleged any significant adverse impacts to the aquatic ecosystem." CERT_000226 (JA0069).

But that is not the relevant measure. Agency action is arbitrary and capricious if the agency applies an incorrect legal standard. *Wild Virginia*, 24 F.4th at 931; *U.S. Forest Serv.*, 897 F.3d at 604-05. Here, WVDEP applied the incorrect legal standard by focusing not on whether MVP *will violate* water quality standards, but on the *severity* of such violations.

The applicable regulation does not include an exception allowing water quality standards violations that do not cause "significant adverse impacts to the aquatic ecosystem." Rather, WVDEP had to be reasonably assured—without

qualification—that stream-crossing construction "will be conducted in a manner which *will not violate* applicable water quality standards." 40 C.F.R. §121.2(a)(3) (2019) (AD010) (emphasis added). *Id*. By excusing repeated, but in its view insignificant, water quality standards violations, WVDEP attempts to rewrite the regulation.

EPA—the agency charged with CWA-implementation—states that "the CWA requires strict compliance with water quality standards," *i.e.*, they "are legally required to be met [at] all times." 49 Fed. Reg. at 38,038, *cited with approval in Sierra Club v. Union Oil Co.*, 813 F.2d 1480, 1489 (9th Cir. 1987), *judgment vacated*, 485 U.S. 931 (1988), *judgment reinstated*, 853 F.2d 667, 672 (9th Cir. 1988). Here, WVDEP violated those principles. A determination that only *minor* or *insignificant* (in WVDEP's view) water quality standards violations will occur cannot suffice under the applicable regulation, leaving WVDEP's Certification arbitrary and capricious for failure to apply the proper legal standard. *Wild Virginia*, 24 F.4th at 931.

Time and again, this Court has recognized that "the CWA creates a regime of strict liability for violations of its standards." *See, e.g.*, *Am. Canoe Ass'n v. Murphy Farms*, 412 F.3d 536, 540 (4th Cir. 2005) (citing *Stoddard v. W. Carolina Reg'l Sewer Auth.*, 784 F.2d 1200, 1208 (4th Cir. 1986)). Nothing in *SWCB*—the Virginia upland §401 certification case—implicitly overrules that line of cases or otherwise

condones "minor" violations of water quality standards. The "minor, short-term issues" and "momentary exceedances" this Court discussed in *SWCB* were *not* water quality standards violations. *SWCB*, 898 F.3d at 405. Rather, they were "exceedances of pre-construction sedimentation levels"—*i.e.*, baseline conditions. *Id.* at 407-08. Importantly, in *SWCB*, this Court determined that such temporary exceedances of baseline conditions were *not* violations of the antidegradation water quality standard. *Id.* at 405. Nothing in *SWCB* blesses actual water quality standards violations (minor or otherwise), or overrules this Court's prior holdings that the CWA is a strict liability statute. *See McMellon v. United States*, 387 F.3d 329, 332-33 (4th Cir. 2004) (one panel opinion cannot overrule another; the earlier of conflicting opinions controls).

## II.    WVDEP UNLAWFULLY FAILED TO INCLUDE REQUIRED CONDITIONS IN THE CERTIFICATION.

CWA §401(d) provides that certifications "shall set forth any … limitations[] and monitoring requirements necessary to assure" that the applicant will comply with certain CWA provisions and "appropriate requirement[s] of State law." 33 U.S.C. §1341(d) (AD008). The Supreme Court has recognized that state water quality standards are among the CWA provisions contemplated by §401(d). *PUD No. 1*, 511 U.S. at 712-13. And EPA's regulations require §401 certifications to include "[a] statement of any conditions which the certifying agency deems

necessary … with respect to the discharge of the activity[.]" 40 C.F.R. §121.2(a)(4) (2019) (AD010).

Interpreting §401(d), this Court recently explained that, "[i]f the state concludes that conditions on the operation of the project are necessary to ensure compliance with its water quality standards, those conditions *must* be set out in the §401 certification." *N.C. Dep't of Envtl. Quality*, 3 F.4th at 661 (emphasis added); *accord Lake Carriers' Ass'n v. E.P.A.*, 652 F.3d 1, 3 (D.C. Cir. 2011). Thus, when a state determines that an applicant must perform some act to ensure compliance with water quality standards, the §401 certification must include a condition requiring that act.

Here, WVDEP determined that "MVP must comply with the [Stormwater Permit], implement the proposed SWPPP, *and* comply with Certification conditions to control potential sediment discharges from the Project to ensure appropriate protection of aquatic resources, water quality and prevent degradation of State waters." CERT_000231 (JA0074) (emphasis added)*; see also* CERT_000006, CERT_000010, CERT_000212-14, CERT_000217-20, CERT_000223, CERT_000230-32 (JA0006, JA0010, JA0055-57, JA0060-63, JA0066, JA0073-75). Nonetheless, WVDEP failed to make compliance with the Stormwater Permit or SWPPP a condition of the Certification. CERT_000014-19 (JA0014-19).

For that reason, WVDEP's issuance of the certification was not in accordance with law and must be vacated. 5 U.S.C. §706(2)(a). In WVDEP's view, compliance with the Stormwater Permit and the SWPPP is necessary to ensure compliance with water quality standards. Accordingly, WVDEP was required to include Certificate conditions requiring Stormwater Permit and SWPPP compliance. *N.C. Dep't of Envtl. Quality*, 3 F.4th at 661; 33 U.S.C. §1341(d) (AD008); 40 C.F.R. §121.2(a)(4) (2019) (AD010). Because WVDEP did not do so, the Certification must be vacated. *Sierra Club I*, 909 F.3d at 655.

WVDEP's failure to condition the Certification on Stormwater Permit and SWPPP compliance further distinguishes this case from *SWCB*. In *SWCB*, this Court upheld Virginia's reliance on compliance with BMPs to support a reasonable assurance determination. 898 F.3d at 396-97. But, in that case, Virginia had specifically conditioned its §401 certification on compliance with the standards and practices that it had determined assured compliance with water quality standards. *Id.*; *see also Sierra Club v. State Water Control Bd.*, No, 17-2406, ECF #3-2, Condition 13 (4th Cir. Dec. 8, 2017).

WVDEP's failure to condition the Certification in a similar way constitutes prejudicial error because the NGA preempts application of purely state-law requirements. *See Schneidewind v. ANR Pipeline Co.*, 485 U.S. 293, 300-01 (1988); *Atl. Coast Pipeline, LLC v. Nelson County Bd. of Supervisors*, 443 F.Supp.3d 670,

683 (W.D. Va. 2020). MVP has a history of using preemption to attack state-law restrictions it does not like. *See Mountain Valley Pipeline, LLC v. Wender*, 337 F.Supp.3d 656, 666 (S.D. W. Va. 2018). Any state-law requirement not enshrined as a §401 certification condition is thus potentially vulnerable to a preemption challenge. *Islander E. Pipeline Co., LLC v. McCarthy*, 525 F.3d 141, 143-44 (2d Cir. 2008) (explaining that, unlike other state laws, the NGA does not preempt requirements imposed through a CWA §401 certification). The Stormwater Permit and the SWPPP are creatures of state law. CERT_000005 (JA0005); W. Va. Dep't of Envtl. Prot., Responsiveness Summary, WV Permit No. WV0116815, Registration Application No. WVR310667, Mountain Valley Pipeline, LLC at 7 (Nov. 1, 2017) ("Responsiveness Summary") (JA1643). Because WVDEP failed to mandate compliance with the state-law requirements of the Stormwater Permit and SWPPP as Certification conditions, its reliance on those requirements was unfounded in a manner not present in *SWCB* and in contravention of the requirements of §401(d) recognized by this Court in *N.C. Dep't of Envtl. Quality*, 3 F.4th at 661.

## III.  WVDEP'S CONCLUSION THAT MVP'S STREAM-CROSSING PLANS ARE CONSISTENT WITH THE AGENCY'S BMP MANUAL IS ARBITRARY AND CAPRICIOUS.

WVDEP rested the Certification squarely on its belief that MVP would use "appropriate BMPs" "consistent with WVDEP's BMP Manual." *Id.* CERT_000007,

CERT_000223 (JA0007, JA0066). But where an agency "rest[s] its determination, at least in part, on [an] infirm … ground," the court must set the action "aside as arbitrary and capricious." *Williams Gas Processing-Gulf Coast Co.*, 475 F.3d at 329-30. Because MVP's construction plans are *not* consistent with the BMP Manual in two important respects, WVDEP's decision rests on "infirm … ground" and is therefore arbitrary and capricious. *Id.*

WVDEP's BMP Manual is intended to aid compliance with West Virginia's narrative water quality criteria prohibiting visible solids or sediment deposits by "provid[ing] standardized and comprehensive erosion and sediment control management practices." BMP Manual at 1-1, 1-3 (AD091, AD093). To deviate from the BMP Manual's prescriptions, a party must seek and obtain WVDEP approval. *Id.* at 2.3-2.4 (AD100-01).

The first discussion of the BMP Manual in WVDEP's most recent §401 proceedings is in an October 5, 2021 MVP submission to WVDEP responding to public comments on its §401 certification application. COMM_000758 (JA1096). In that document, MVP asserted that its "in-stream BMPs … are consistent with WVDEP's BMP Manual[.]" COMM_000778 (JA1116). Notably, MVP did not seek—and WVDEP did not approve—any deviations from the BMP Manual's requirements. *See generally* COMM_000758-90 (JA1096-128).

— 40 —

In the Certification, WVDEP echoed (twice) MVP's contention that its stream-crossing plans are consistent with the BMP Manual, without explanation. CERT_000007, CERT_000223 (JA0007, JA0066). But MVP's proposed crossing methods fail to meet the BMP Manual's requirements in two important ways: [7] (1) MVP rejects the BMP Manual's preference for less-damaging trenchless crossings without credibly establishing the impracticability of such crossings, and (2) MVP intends to trench through streams with drainage areas greater than one square-mile. Because WVDEP's determination that MVP's plans are consistent with the BMP Manual runs counter to the record, the Certification is arbitrary and capricious. *U.S. Forest Serv.*, 897 F.3d at 594.

### A. MVP's Crossing Methods Are Inconsistent With The BMP Manual Because MVP Intends To Use Open-Cut Crossings Without Credibly Establishing The Impracticability Of Trenchless Methods.

The BMP Manual specifies trenchless methods as the least damaging and preferred alternative for Instream BMPs. BMP Manual at 3.21-2, -4 (AD120, AD122). Because the majority of MVP's proposed crossings are *not* trenchless crossings, its plans are inconsistent with the requirements of the BMP Manual. That

---

7 This is yet another way this case is different from *SWCB*. In that case, the petitioners did not allege MVP's construction would be inconsistent with the "tried and true" BMPs on which Virginia relied, but rather simply claimed those measures would be inadequate. *See SWCB*, 898 F.3d at 404.

alone renders the Certification arbitrary and capricious because WVDEP's explanation runs counter to the record. *U.S. Forest Serv.*, 897 F.3d at 594.

Moreover, the Manual requires WVDEP approval of deviations from its prescriptions. BMP Manual at 2.3-2.4 (AD100-01). As discussed above, MVP represented that its in-stream construction methods were consistent with the BMP Manual and did not seek approval to deviate from the manual's specification for trenchless crossings. COMM_000778 (JA1116). Even if the Certification itself were construed as an approval of deviation from the BMP Manual, WVDEP would remain obligated to articulate "a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Friends of Buckingham*, 947 F.3d at 83. Here, that would have required WVDEP to evaluate MVP's application on a crossing-by-crossing basis to determine the practicality of trenchless crossings, given the requirements of WVDEP's §401 certification rule and application instructions. W. Va. C.S.R. §47-5A-4.2 (AD021); Application Instructions at 3 (AD080). That did not happen.

MVP submitted an alternatives analysis in its application, but rejected trenchless methods for most crossings. APP_000013 (JA0091); Table 15 (JA1470-518). During the public comment period, Petitioners informed WVDEP of MVP's history of inconsistent representations about the feasibility of various stream

crossing methods. COMM_000104-16 (JA0751-63). [8] Nonetheless, WVDEP ignored MVP's inconsistencies and, in the Certification, conclusorily asserted that MVP's alternatives analysis was "reasonable" and sufficiently demonstrated that "trenchless crossings were impracticable," resulting in the selection of "the least environmentally damaging alternative." CERT_000212-14 (JA0055-57). But those unexplained conclusions are not supported by the record.

WVDEP's blind acceptance of MVP's alternatives analysis was unreasonable because MVP lacks credibility about whether trenchless technologies are practicable at any particular location. Over the years, MVP has rejected as impracticable many trenchless crossings that it now proposes to construct; and has previously proposed trenchless crossings for locations that it now rejects.

For example, MVP told FERC in 2016 that trenching under three rivers at issue in *Sierra Club I*—the Elk, Gauley and Greenbrier Rivers—"pose[s] a risk of failure that is likely insurmountable." Waterbody Crossing Review at 8-10 (JA0965-67). In its current plans, however, MVP appears to have surmounted the "insurmountable" and now admits that those trenchless crossings are practicable. CERT_000011 (JA0011). Moreover, in November 2020, MVP told FERC that 38

---

8  Consequently, the crossing-method issue was squarely before WVDEP. *Azar*, 973 F.3d at 290.

crossings in West Virginia were "well suited for conventional bores"[9] only to abandon that plan and tell WVDEP just three months later that conventional bores at those very crossings are impracticable.[10]

In short, MVP has a demonstrated history of saying whatever it needs to say about alternative crossing methods to gain approval of its preferred methods. WVDEP therefore had a heightened obligation to verify MVP's assertions about crossing-method feasibility and could not simply accept MVP's assertions. *See Colo. Fire Sprinkler, Inc. v. N.L.R.B.*, 891 F.3d 1031, 1041 (D.C. Cir. 2018) (vacating agency decision because of its reliance on untrustworthy information). Although an agency may "base its *analysis* 'entirely upon information supplied by the applicant,'" *Crutchfield v. County of Hanover, VA*, 325 F.3d 211, 223 (4th Cir. 2003) (emphasis added; quoting *Friends of the Earth v. Hintz*, 800 F.2d 822, 834-36 (9th Cir. 1986)), it "nonetheless ha[s] an obligation to independently verify the information supplied to it." *Hintz*, 800 F.2d at 835.

Yet, WVDEP did not even flinch at MVP's abrupt about-face. Petitioners have not found any place in the record where WVDEP confronts MVP's prior

---

9 Nov. 2020 Supp. Envtl. Rpt. at 1-2, tbl. A-1 (JA0998, JA1019-20).

10 Table 15 at 1-5 (JA1470-74) (rejecting trenchless crossings as impracticable for 38 of the 41 proposed trenchless crossings in Appendix A of the Nov. 2020 Supp. Envtl. Rpt.). MVP certified the accuracy of *both* the November 2020 representation to FERC *and* the February 2021 contradictory representation to WVDEP. *See* 18 C.F.R. §157.6(a)(4)(i); APP_000014 (JA0092).

inconsistent statements. Where the Certification purports to address MVP's crossing-method determination, it invariably recites MVP's submissions before transitioning directly to WVDEP's bare conclusions. CERT_000212-14 (JA_0055-57). Unlike *Hintz*, where the Ninth Circuit was satisfied the agency had "exhaustively studied" the applicant's information, 800 F.2d at 835, here there is no evidence of study, exhaustive or otherwise. Rather, WVDEP's decision exhibits the sort of "blind acceptance" that a court cannot condone. *Id.* at 836. The Certification is therefore arbitrary and capricious because WVDEP either entirely failed to address an important aspect of the problem, *U.S. Forest Serv.*, 897 F.3d at 594, or resolve an evidentiary conflict before it, *Friends of Buckingham*, 947 F.3d at 87-90. It also violated WVDEP's obligation to respond to significant comments, W. Va. C.S.R. §47-5A-5.1.e (AD026), rendering the Certification arbitrary and capricious. *State of S.C. ex rel. Tindal v. Block*, 717 F.2d 874, 886 (4th Cir. 1983).

## B. MVP's Crossing Plans Are Inconsistent With The BMP Manual Because MVP Intends To Trench Through Streams With Large Drainage Areas.

Even if MVP's open-cut crossings were otherwise permissible, they would still run afoul of the BMP Manual's requirements. One of the BMP Manual's General Design Criteria for Instream BMPs provides that "[t]he drainage area [above the crossing location] should be no greater than one square mile[.]" BMP Manual at 3.21-3 (AD121). But here, WVDEP entirely failed to evaluate the drainage areas of

MVP's crossings. Consequently, WVDEP failed to consider an important aspect of the problem before concluding that MVP's plans are consistent with the BMP Manual. Had it evaluated the drainage areas, it would have recognized that many of MVP's proposed open-cut crossings are at locations where upstream drainage areas exceed one square mile. Accordingly, the Certification is arbitrary and capricious. *U.S. Forest Serv.*, 897 F.3d at 604-05.

WVDEP has an online tool available to calculate the drainage area upstream of the crossing locations. Responsiveness Summary at 65 (JA1701). Applying that tool to a small sample of MVP's stream crossings reveals at least nine instances where the upstream drainage area exceeds one square mile:[11]

**Table 1**

| Stream Crossing | Latitude | Longitude | Drainage Area |
|---|---|---|---|
| Hungard Creek | 37.692868 | -80.734247 | 11.433 mi$^2$ |
| Buffalo Creek | 37.863065 | -80.757391 | 3.688 mi$^2$ |
| Hominy Creek | 38.178889 | -80.72979 | 48.193 mi$^2$ |
| Lost Run | 38.483002 | -80.556464 | 2.781 mi$^2$ |
| Right Fork Holly Creek | 38.648021 | -80.489704 | 56.589 mi$^2$ |
| Falls Run | 38.778955 | -80.525862 | 8.025 mi$^2$ |
| Knawl Creek | 38.823595 | -80.525342 | 3.777 mi$^2$ |
| Left Fork Knawl Creek | 38.824034 | -80.524988 | 2.640 mi$^2$ |
| Oil Creek | 38.893014 | -80.556192 | 7.208 mi$^2$ |

---

11 Table 1 is based on Exhibit 23 to Petitioners' stay motion (ECF #27-24), which consists of screenshots of the results generated by inputting the coordinates of certain crossings into WVDEP's online drainage area tool. Petitioners request that the Court take judicial notice of the results of the application of WVDEP's tool to the streams in Table 1 because "geographical information is especially appropriate for judicial notice." *United States v. Johnson*, 726 F.2d 1018, 1021 (4th Cir. 1984); *see also Hoyt v. Russell*, 117 U.S. 401, 404-05 (1886) (holding

Nonetheless, WVDEP did not even attempt to determine the upstream drainage areas before concluding that MVP's proposed crossings were consistent with the BMP Manual and its restriction on drainage area size. As a result, the Certification is arbitrary and capricious. *U.S. Forest Serv.*, 897 F.3d at 594, 604-05.

## IV.   WVDEP'S BELIEF THAT EPA ENDORSES BMPS DURING INSTREAM CONSTRUCTION TO PROTECT WATER QUALITY STANDARDS RUNS COUNTER TO THE RECORD.

WVDEP's mistaken belief that EPA endorses construction stormwater BMPs as a method to ensure water-quality compliance during instream construction was another significant factor in its Certification issuance. WVDEP turned to EPA "first"—and repeatedly—to support its belief that MVP's crossing methods would protect water quality standards. CERT_000004, CERT_000007, CERT_000011, CERT_000213, CERT_000218, CERT_000220-25 (JA0004, JA0007, JA0011, JA0056, JA0061, JA0063-68). WVDEP's explanations run counter to the record, however, because (1) EPA never determined that BMPs, including those proposed by MVP, control discharges sufficiently during instream construction to protect

---

judicial notice appropriate even where "calculations and inquiries on the subject [are] necessary").

water quality standards, and (2) EPA has concerns that MVP's plans will cause or contribute to water quality standards violations. COMM_000706 (JA1067).**[12]**

EPA's Construction General Permit cited by WVDEP applies to construction *on land*. *See, e.g.*, REL_002069 (JA2107). It does not authorize discharges from instream construction. REL_002072-75 (JA2108-11). EPA's Construction General Permit is an exercise of EPA's CWA §402 authority. REL_002061 (JA2102). CWA §402 establishes a permitting program for the discharge of pollutants that are *not* dredged or fill material. 33 U.S.C. §1342(a)(1). CWA §402(p) requires regulation of certain stormwater discharges—*i.e.*, overland runoff that picks up pollutants and is conveyed to a waterbody[13]—under that program. *Id.* §1342(p). Stormwater discharges from land disturbed by construction activities require a §402 permit. 40 C.F.R. §122.26(b)(15)(i). EPA's Construction General Permit—and state equivalents—satisfy that requirement.

Instream construction, however, results in discharges of dredged or fill material, and is therefore regulated by the Corps under CWA §404. 33 U.S.C. §1344; *see also* CERT_000001 (JA0001). The Supreme Court has held "that if the Corps has authority to issue a permit for a discharge under §404, then the EPA lacks

---

12 This is another difference from *SWCB* because, in that case, there was no contention that Virginia's explanation of its reliance on EPA ran counter to the record. 898 F.3d at 404.

13 *See*, *e.g.*, https://www.epa.gov/npdes/npdes-stormwater-program.

authority to do so under §402." *Coeur Alaska*, 557 U.S. at 273-74. Upland construction requiring a §402 permit for stormwater discharges may occur *in conjunction with* §404 instream construction, but that does not give EPA §402 authority over instream construction.

That EPA's Construction General Permit cannot directly regulate discharges of dredged or fill material does not mean that EPA does not play a role in permitting §404 activities. *Coeur Alaska*, 557 U.S. 274. EPA has significant oversight of Corps §404 permitting. *Id.* (citing 33 U.S.C. §1344(b)-(c)). Indeed, on this project, EPA recommended the Corps not issue MVP's sought permit because it "may not comply with the [§404(b)(1)] Guidelines," including the requirement that the Corps approve only the least environmentally damaging practicable alternative and the prohibitions against significant degradation. COMM_000704, COMM_000706 (JA1065, JA1067). Indeed, EPA—having reviewed MVP's stream-crossing plans—expressed concern that the project could "cause or contribute to water quality standards exceedances." COMM_000706 (JA1067).

In short, EPA did not—and *could* not—regulate instream construction through its Construction General Permit. Accordingly, it did not conclude that the permit's BMPs would protect water quality standards during instream construction. Moreover, on this very project EPA specifically expressed concerns that instream construction could result in water quality standards violations. COMM_000706

— 49 —

(JA1067). WVDEP's reliance on EPA's Construction General Permit as a basis for its determination that the Pipeline's waterbody crossings will comply with water quality standards was thus arbitrary and capricious.

## V.    WVDEP ARBITRARILY AND CAPRICIOUSLY REFUSED TO CONDUCT LOCATION-SPECIFIC ANTIDEGRADATION REVIEWS.

As WVDEP concedes, the State's antidegradation policy serves to prevent the lowering of water quality and "generally contemplates the collection of baseline water quality data" and predictions of the impacts of discharges on those baselines. CERT_000213, CERT_000221 (JA0056, JA0064); W. Va. C.S.R. §60-5-3.4, -4.7, -5.6.c, -6.1 (AD035, AD037, AD040, AD043). For example, antidegradation review of high-quality Tier 2 waters requires a location-specific review of baseline conditions and a determination of the additional pollution that would result from proposed activities, in order to assess and protect the "assimilative capacity" of those waters beyond the bare minimum needed to meet water quality criteria. W. Va. C.S.R. §60-5-5.6.c (AD040); *Horinko*, 279 F.Supp.2d at 761-62 (holding that West Virginia's antidegradation review must be "location-specific"). WVDEP unreasonably and unlawfully refused to conduct that review, however, notwithstanding MVP's submission of at least some baseline data late in the process. CERT_000219 (JA0062). WVDEP offers multiple excuses for not performing the required location-specific antidegradation reviews, each of which fails.

### A.    WVDEP Impermissibly Relied On Surrogates For Location-Specific Antidegradation Review.

Some of WVDEP's excuses for not complying with its antidegradation procedures suffer from the same fatal defects described above. For example, ignoring EPA's warning that MVP's proposed crossings may lead to significant degradation (COMM_000703-04 (JA1064-65)), WVDEP refused to conduct location-specific antidegradation review based on its belief "that the application of [its Stormwater Permit and BMP Manual] programs to MVP's [stream crossings] will prevent any significant degradation of water quality or water uses," (CERT_000006 (JA0006)). But, as explained above, WVDEP's reliance on the Stormwater Permit and BMP Manual was arbitrary and capricious and distinguishable from the permit and BMP reliance upheld in *SWCB*, 898 F.3d at 396-97, 404-05. *See* Sections I-III, *supra*.

Other excuses offered by WVDEP fail for reasons specific to the West Virginia program, and hence this Court's Virginia-specific conclusions in *SWCB* are not controlling. ***First,*** when properly construed, West Virginia's program allows reliance on BMPs to suffice for antidegradation review of *nonpoint* sources,[14] but

---

14 "Nonpoint source pollution is caused by rainfall or snowmelt moving over and through the ground and carrying natural and human-made pollutants into lakes, rivers, streams, wetlands, estuaries, other coastal waters, and ground water." 68 Fed. Reg. 60,653, 60,655 (Oct. 23, 2003).

not for the point-source activities at issue here.[15] ***Second,*** WVDEP misconstrues its antidegradation program when it contends that other processes, such as state and federal stormwater permitting programs, can obviate the need to follow West Virginia antidegradation review procedures.

### 1. West Virginia's Antidegradation Program Does Not Authorize Reliance On BMPs For Point Sources.

As part of its attempt to make its antidegradation analysis resemble the analysis this Court upheld in *SWCB*, WVDEP relies on BMPs to insist that location-specific antidegradation review is not necessary. CERT_000226 (JA0069) (citing *SWCB*, 898 F.3d at 405). WVDEP asserts that such review is unnecessary in the absence of significant degradation, CERT_000217 (JA0060), and contends that, under its antidegradation rule, "the proposed Project impacts were not deemed to be significant since appropriate [BMPs] are to be utilized ensuring protection from sediment entering waters." CERT_000008 (JA0008).

Even if WVDEP's reliance on BMPs were not arbitrary and capricious for the reasons explained above, it would run afoul of specific provisions of West Virginia's antidegradation program. Specifically, W. Va. C.S.R. §60-5-1.5.b provides:

> *Nonpoint source activities* will be deemed to be in compliance with antidegradation requirements with the installation and maintenance of

---

[15] "The Clean Water Act section 404 permitting program addresses the discharge of dredged or fill material from a point source into 'waters of the United States[.]'" 86 Fed. Reg. 69,372, 69,376 (Dec. 7, 2021).

cost-effective and reasonable *best management practices* in accordance
with [W. Va. C.S.R. §47-2-4.1.b]. These include, but are not limited
to ... programs for oil and gas operations administered by the Office of
Oil and Gas of the Department of Environmental Protection[.]

(AD032) (emphasis added). In turn, W. Va. C.S.R. §47-2-4.1.b—part of West

Virginia's antidegradation policy—provides:

[T]he secretary shall assure that all new and existing *point sources* shall
achieve the highest established statutory and regulatory requirements
applicable to them *and shall assure the achievement of cost-effective
and reasonable best management practices (BMPs) for non-point
source control.*

(AD015) (emphasis added).

Under those provisions, although the use of BMPs can suffice to satisfy

antidegradation requirements for *nonpoint sources* (W. Va. C.S.R. §60-5-1.5.b

(AD032)), more is required for *point sources* like those at issue here (W. Va. C.S.R.

§47-2-4.1.b (AD015)). Point sources "shall achieve the highest established statutory

and regulatory requirements applicable to them" (*id.*); BMPs will not suffice for

antidegradation purposes. [16] The specific allowance for reliance on BMPs for

nonpoint sources for antidegradation purposes in §60-5-1.5.b must be construed as

a *disallowance* of such reliance for point sources. *Feathers v. W. Va. Bd. of Med.*,

---

[16] Statutory and regulatory requirements applicable to §404 point source discharges
include, *inter alia*, the Section 404(b)(1) guidelines (40 C.F.R. Part 230), and
W. Va. C.S.R. §60-5-3.8 (AD036), which contemplates location-specific
antidegradation review for activities regulated by individual §404 permits.

562 S.E.2d 488, 494 (W. Va. 2001) (applying canons of statutory interpretation to West Virginia legislative rules); Syll. Pt. 3, *Manchin v. Dunfee*, 327 S.E.2d 710, 711 (W. Va. 1984) ("In the interpretation of statutory provisions the familiar maxim *expression unius est exclusion alterius*, the express mention of one thing implies the exclusion of another, applies."). Consequently, WVDEP's attempt to rely on BMPs to excuse MVP from location-specific antidegradation review violates West Virginia's antidegradation implementation regulations and must be vacated. *Sierra Club I*, 909 F.3d at 655.

## 2.  WVDEP Cannot Rely On Other Environmental Processes To Satisfy Substantive Antidegradation Requirements.

WVDEP also erroneously maintains that it can rely on other regulatory processes to obviate the need for location-specific antidegradation review. In support, WVDEP cites W. Va. C.S.R. §60-5-1.5.d, which provides: "*Information* contained within existing environmental processes and reviews, such as environmental assessments, environmental impact statements, facilities plans, and findings of no significant impact, may be used to provide part or all of the requirements of the antidegradation procedure and review." (AD032) (emphasis added).

Under the plain language of §60-5-1.5.d, WVDEP may look to other environmental reviews, including National Environmental Policy Act ("NEPA") documents like environmental impact statements, environmental assessments, or

— 54 —

findings of no significant impact statements, to obtain *information—i.e.*, data—to satisfy the information requirements of the antidegradation rules—like the baseline data requirements of W. Va. C.S.R. §60-5-3.4 (AD035). But §60-5-1.5.d does not allow WVDEP to substitute a different regulatory *process* for the required *substance* of an antidegradation review, as it attempts to do here.

WVDEP asserts that, pursuant to §60-5-1.5.d, it "relies on" its Stormwater Permit "to make the necessary demonstration of compliance" with antidegradation requirements. CERT_000222 (JA0065). WVDEP similarly points to §60.5-1.5.d to justify its reliance on EPA's Construction General Permit. CERT_000221 (JA0064). It is clear from WVDEP's references to §60-5-1.5.d throughout the Certification that it misconstrues that provision to allow it to substitute unrelated processes for the antidegradation review itself, as opposed to merely relying on those processes to provide the information necessary to conduct such a review. CERT_000004, CERT_000007, CERT_000221-22 (JA0004, JA0007, JA0064-65). That misinterpretation renders the Certification not in accordance with law. *Sierra Club I*, 909 F.3d at 655

Moreover, the processes on which WVDEP purports to rely—the Stormwater Permit and EPA's Construction General Permit—cannot substitute for location-specific antidegradation reviews. As discussed above, WVDEP cannot rely on its Stormwater Permit to protect water quality given (1) MVP's history of

noncompliance with that permit, and (2) WVDEP's failure to require compliance with the Stormwater Permit as a Certification condition. *See* Sections I-II, *supra.*

Nor can WVDEP rely on EPA's statement in its construction stormwater permit that "compliance with the [Construction General Permit] generally will be sufficient to satisfy … antidegradation requirements" to avoid location-specific antidegradation review here. REL_002109-10 (JA2113-14). Critically, EPA never concluded that *instream* BMPs are adequate to prevent a lowering of water quality such that Tier 2 review is unnecessary. *See* Section IV, *supra*. And EPA acknowledges that, even in the stormwater context, other available information may rebut its general presumption and necessitate full antidegradation review. REL_002110 (JA2114). Here, other available information—namely MVP's aforementioned history of violating the Stormwater Permit and West Virginia's water quality standards—indicates that location-specific antidegradation review of the capacity of the streams at issue to withstand additional sedimentation is warranted. Indeed, West Virginia's antidegradation procedures provide that "a regulated facility's historic noncompliance with its permit" is an "individual circumstance[] warrant[ing] a full [Tier 2 antidegradation] review." W. Va. C.S.R. §60-5-5.6.a.2 (AD039). Consequently, EPA's general statement in its Construction General Permit cannot rationally explain WVDEP's refusal to follow its antidegradation procedures. *Friends of Buckingham*, 947 F.3d at 83.

## B.    Location-Specific Antidegradation Review Of §404 Discharges Is Required, Possible, And Valuable.

WVDEP's remaining excuses for avoiding antidegradation review are also arbitrary and capricious. In addition to improperly relying on surrogate processes, WVDEP also rejected individualized review because (1) "that type of analysis is not prescribed or appropriate for … discharges of 'dredged or fill' material," (2) baseline data "would not provide the information necessary to evaluate" impacts of future discharges, and (3) "there is no required or readily performable method for predicting the effect of … filling activities" on the streams at issue. CERT_000221 (JA0064). WVDEP views compliance with antidegradation requirements as "complex" (*id.*), but as a federal district court has warned about WVDEP's antidegradation program before, an agency cannot evade its obligations for the sake of convenience. *Horinko*, 279 F.Supp.2d at 748.

WVDEP's final excuses are contrary to law and contradicted by evidence. *Sierra Club I*, 909 F.3d at 655; *U.S. Forest Serv.*, 897 F.3d at 594. **First,** EPA has determined that "States … must apply antidegradation requirements to … any activity that requires a permit or water quality certification … such as … CWA §404 dredge and fill permits[.]" 63 Fed. Reg. 36,742, 36,780 (July 7, 1998). And WVDEP's antidegradation rule authorizes location-specific antidegradation review for projects that require individual §404 permits from the Corps for dredged or fill material discharges. W. Va. C.S.R. §60-5-3.8 (AD036). Consequently, WVDEP's

assertion that location-specific antidegradation review is not "prescribed or appropriate" for CWA §404 projects (CERT_000211 (JA0054)) is wrong as a matter of law.

*Second*, contrary to WVDEP's contention that baseline data "would not provide the information necessary to evaluate" impacts of future discharges (*id.*), such data is required and would provide information necessary to evaluate the effects of MVP's discharges on the receiving waterbodies' assimilative capacity for sediment and ability to meet water quality criteria (W. Va. C.S.R. §60-5-3.4 (AD035)). To understand the capacity of those streams to withstand MVP's additional pollution, WVDEP needed, *inter alia*, data about the macroinvertebrates inhabiting the affected stream beds—known as benthic assessments—on each and every stream. CERT_000140-41 (JA0044-45) (describing adverse effects of pipeline crossing sedimentation on benthic invertebrates). WVDEP's failure to require or evaluate such data resulted in WVDEP failing to examine an important aspect of the problem. *Cf. Friends of Back Bay v. U.S. Army Corps of Eng'rs*, 681 F.3d 581, 588 (4th Cir. 2012) ("A material misapprehension of the baseline conditions existing in advance of an agency action can lay the groundwork for an arbitrary and capricious decision.").

Compliance with West Virginia's narrative water quality standards can be measured through biological assessments, including benthic monitoring. *See Pruitt*,

893 F.3d at 228 (describing the West Virginia Stream Condition Index as a measure of compliance with narrative criteria); *Ohio Valley Envtl. Coalition v. Fola Coal Co.*, 845 F.3d 133, 138, 144 (4th Cir. 2017) (same); *Ohio Valley Envtl. Coalition, Inc. v. U.S. Army Corps of Eng'rs*, 716 F.3d 119, 124 (4th Cir. 2013) (same). Consequently, WVDEP needs to review *baseline* benthic data to understand the present condition of the affected streams before making predictions about effects from instream construction.

Indeed, such baseline data is required by WVDEP's antidegradation rule (W. Va. C.S.R. §60-5-3.4 (AD035)) *and* by the scientific literature examining the effects of pipeline crossings. In order to predict the potential effects of open-cut, dry-ditch crossings on specific streams, "[m]onitoring prior to construction should include both habitat and biological surveys upstream and downstream of the proposed crossing location." CERT_000071 (JA0030). Robust baseline data are needed for "effect assessment" and to provide "valuable information on site-specific characteristics such as sensitive species" CERT_000072 (JA0031). For those reasons, EPA called for the gathering and evaluation of baseline data for the streams at issue in its comments on MVP's §404 permit application. COMM_000708-09 (JA1069-70). But consideration of that sort of information is entirely absent from WVDEP's decision here, notwithstanding MVP's provision of some baseline data late in WVDEP's review of its application. CERT_000219 (JA0062). Baseline data

about the biological status of benthic communities in the affected streams would provide a metric to evaluate potential impacts to water quality from MVP's activities, but WVDEP arbitrarily and capriciously dismissed the need for such evaluations.

**Finally**, WVDEP is wrong, and its explanation runs counter to the record, when it asserts that there are no available methods to predict the sedimentation that would result from stream crossings. CERT_000221 (JA0064). Two available methods would have allowed MVP to predict future sedimentation as part of its antidegradation analysis: review of real-world data and modeling.

WVDEP could have evaluated, through benthic assessments or otherwise, the condition of the 23 streams and 9 wetlands in West Virginia at which MVP completed open-cut crossings before this Court vacated its stream-crossing permit in 2018. CERT_000009 (JA0009). Indeed, WVDEP admitted that inspectors found violations at some of those sites. *Id.* And, from comments submitted by Petitioners,[17] WVDEP was aware of persistent sedimentation downstream from an MVP open-cut, dry-ditch crossing in Virginia "**nearly 40 months after the completion of the crossing.**"[18] Evaluation of real-world data from open-cut crossings that MVP had

---

17 On November 19, 2021, Petitioners sent WVDEP a copy of a comment letter on MVP's §404 permit application. COMM_000910 (JA1130).

18 Letter from Appalachian Mountain Advocates, Inc., et al, to Adam Fannin, U.S. Army Corps of Eng'rs, Re: Public Comments on Public Notice Nos. LRH-2015-00592-GBR, LRP-2015-798, and NAO-2015-0898 (the Mountain Valley Pipeline Project) and on the FERC Environmental Assessment for the Mountain

already constructed was a method available to WVDEP to make predictions about the future crossings. Yet WVDEP arbitrarily and capriciously ignored that data. *See Wild Virginia*, 24 F.4th at 928.

Moreover, as evidenced by modeling MVP performed (at FERC's insistence) of the sedimentation effects of its proposed open-cut crossings of the Elk, Gauley, and Greenbrier Rivers prior to 2017, predictions of turbidity and sedimentation from crossings are possible through the use of models. REL_000421 (JA1294); *see also* Hansen & Betcher, *Sediment Generation and Impacts from Dry-Ditch Open-Cut Stream Crossings Such as Those Proposed for the Mountain Valley Pipeline* 6 (May 26, 2021) (JA0955) (noting the absence from MVP's application of "site-specific … modeling to predict the scale of impacts"). Petitioners brought the availability of such modeling to WVDEP's attention in comments, COMM_000171 (JA0818), yet WVDEP ignored that availability and arbitrarily and capriciously concluded that there were no methods available to make location-specific sedimentation predictions in an antidegradation review.

---

Valley Pipeline Project at 59-61 (Nov. 19, 2021) (JA1190-92) (emphasis original).

## **CONCLUSION**

For the foregoing reasons, Petitioners respectfully request that this Court vacate WVDEP's December 30, 2021 §401 Certification.

## **REQUEST FOR ORAL ARGUMENT**

Petitioners respectfully request that this Court allow oral argument on this petition for review because it presents questions of continuing and important public interest. MVP will trench through hundreds of streams and wetlands under the Certification at issue. Moreover, given the legal and factual issues presented, the decisional process would be aided by oral argument.

DATED:     June 7, 2022          Respectfully submitted,

**/s/ DEREK O. TEANEY**
DEREK O. TEANEY
BENJAMIN A. LUCKETT
ELIZABETH A. BOWER
APPALACHIAN MOUNTAIN ADVOCATES, INC.
Post Office Box 507
Lewisburg, West Virginia 24901
Telephone:  (304) 646-1182
Email:         dteaney@appalmad.org
*Counsel for Petitioners*

**UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT**

No. __22-1008__      **Caption:** __Sierra Club et al. v. W. Va. Dep't of Envtl. Prot. et al.__

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT**
Type-Volume Limit, Typeface Requirements, and Type-Style Requirements

**Type-Volume Limit for Briefs if Produced Using a Computer:** Appellant's Opening Brief, Appellee's Response Brief, and Appellant's Response/Reply Brief may not exceed 13,000 words or 1,300 lines.  Appellee's Opening/Response Brief  may not exceed 15,300 words or 1,500 lines.  A Reply or Amicus Brief may not exceed 6,500 words or 650 lines. Amicus Brief in support of an Opening/Response Brief may not exceed 7,650 words. Amicus Brief filed during consideration of petition for rehearing may not exceed 2,600 words. Counsel may rely on the word or line count of the word processing program used to prepare the document. The word-processing program must be set to include headings, footnotes, and quotes in the count. Line count is used only with monospaced type. See Fed. R. App. P. 28.1(e), 29(a)(5), 32(a)(7)(B) & 32(f).

**Type-Volume Limit for Other Documents if Produced Using a Computer:** Petition for permission to appeal and a motion or response thereto may not exceed 5,200 words. Reply to a motion may not exceed 2,600 words. Petition for writ of mandamus or prohibition or other extraordinary writ may not exceed 7,800 words. Petition for rehearing or rehearing en banc may not exceed 3,900 words.  Fed. R. App. P. 5(c)(1), 21(d), 27(d)(2), 35(b)(2) & 40(b)(1).

**Typeface and Type Style Requirements:** A proportionally spaced typeface (such as Times New Roman) must include serifs and must be 14-point or larger.  A monospaced typeface (such as Courier New) must be 12-point or larger (at least 10½ characters per inch). Fed. R. App. P. 32(a)(5), 32(a)(6).

This brief or other document complies with type-volume limits because, excluding the parts of the document exempted by Fed. R. App. P. 32(f) (cover page, disclosure statement, table of contents, table of citations, statement regarding oral argument, signature block, certificates of counsel, addendum, attachments):

[✔]      this brief or other document contains ____13,000____ [*state number of*] words

[ ]      this brief uses monospaced type and contains _____ [*state number of*] lines

This brief or other document complies with the typeface and type style requirements because:

[ ]      this brief or other document has been prepared in a proportionally spaced typeface using
_____ [*identify word processing program*] in
_____ [*identify font size and type style*]; **or**

[ ]      this brief or other document has been prepared in a monospaced typeface using
_____ [*identify word processing program*] in
_____ [*identify font size and type style*].

(s) __/s/ DEREK O. TEANEY__

Party Name __Petitioners__

Dated: __June 7, 2022__

— 63 —

Print to PDF for Filing      Reset Form      04/12/2020  SCC

## CERTIFICATE OF SERVICE

I hereby certify that, on June 7, 2022, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Fourth Circuit by using the appellate CM/ECF system. The participants in the case are registered CM/ECF users and service will be accomplished by the appellate CM/ECF system.

DATED:    June 7, 2022        **/s/ DEREK O. TEANEY**
                              DEREK O. TEANEY
                              APPALACHIAN MOUNTAIN ADVOCATES, INC.
                              Post Office Box 507
                              Lewisburg, West Virginia 24901
                              Telephone:  (304) 646-1182
                              Email:        dteaney@appalmad.org
                                  *Counsel for Petitioners*