No. 22-1008

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

---

SIERRA CLUB, ET AL.,
Petitioners,

v.

WEST VIRGINIA DEPARTMENT OF ENVIRONMENTAL
PROTECTION, ET AL.,
Respondents,

and

MOUNTAIN VALLEY PIPELINE, LLC,
Intervenor.

---

## MOUNTAIN VALLEY PIPELINE, LLC'S
## FINAL RESPONSE BRIEF

---

George P. Sibley, III
J. Pierce Lamberson
gsibley@hunton.com
plamberson@hunton.com
**HUNTON ANDREWS KURTH LLP**
951 E. Byrd Street
Richmond, Virginia 23219
Telephone: (804) 788-8200

Deidre G. Duncan
dduncan@hunton.com
**HUNTON ANDREWS KURTH LLP**
2200 Pennsylvania Avenue, NW
Washington, DC 20037
Telephone: (202) 955-1500

Robert G. McLusky
Jennifer L. Hughes
rmclusky@jacksonkelly.com
jlhughes@jacksonkelly.com
**JACKSON KELLY PLLC**
500 Lee Street East
Charleston, WV 25301
Telephone: (304) 340-1381

Justin W. Curtis
justin@aqualaw.com
**AQUALAW PLC**
6 South 5th Street
Richmond, Virginia 23219
Telephone: (804) 716-9021

*Counsel for Mountain Valley Pipeline, LLC*

## UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

### DISCLOSURE STATEMENT

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. __22-1008__       Caption: __Sierra Club, et al. v. West Virginia Dep't of Envtl. Prot., et al.__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__Mountain Valley Pipeline, LLC__
(name of party/amicus)

_____

who is _____Intervenor_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.  Is party/amicus a publicly held corporation or other publicly held entity?  ☐YES ☑NO

2.  Does party/amicus have any parent corporations?  ☑YES ☐NO
    If yes, identify all parent corporations, including all generations of parent corporations:

    Mountain Valley Pipeline, LLC (MVP) is organized as a series limited liability company and has members. MVP's members that hold interests in the Mountain Valley Pipeline project are: MVP Holdco, LLC (MVP Holdco); US Marcellus Gas Infrastructure, LLC (USG); WGL Sustainable Energy LLC (formerly WGL Midstream, Inc.) (WGL); RGC Midstream, LLC and Con Edison Gas

3.  Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?  ☑YES ☐NO
    If yes, identify all such owners:

    Publicly held entities hold, indirectly through members of MVP, at least 10% of the interests in the Mountain Valley Pipeline project. Equitrans Midstream Corporation (NYSE: ETRN), the parent company of MVP Holdco, indirectly owns a 46.84% interest; NextEra Energy, Inc. (NYSE: NEE), the parent company of USG, indirectly owns a 31.913% interest; Consolidated Edison, Inc. (NYSE: ED), the parent company of ConEd, indirectly owns an 11.217% interest; and AltaGas Ltd. (TSX: ALA), the parent company of WGL, indirectly owns a 10.0% interest.

4.  Is there any other publicly held corporation or other publicly held entity that has a direct
    financial interest in the outcome of the litigation?                    ☑YES ☐NO
    If yes, identify entity and nature of interest:

    RGC Resources Inc. (NASDAQ: RGCO), the parent company of RGC Midstream, LLC,
    indirectly owns a 1.03% interest in the Mountain Valley Pipeline project. Therefore, RGC
    Resources Inc. has an indirect financial interest in the outcome of the litigation

5.  Is party a trade association? (amici curiae do not complete this question)    ☐YES ☑NO
    If yes, identify any publicly held member whose stock or equity value could be affected
    substantially by the outcome of the proceeding or whose claims the trade association is
    pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?                    ☐YES ☑NO
    If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a
    party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the
    caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held
    corporation that owns 10% or more of the stock of the debtor.

7.  Is this a criminal case in which there was an organizational victim?    ☐YES ☑NO
    If yes, the United States, absent good cause shown, must list (1) each organizational
    victim of the criminal activity and (2) if an organizational victim is a corporation, the
    parent corporation and any publicly held corporation that owns 10% or more of the stock
    of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ George P. Sibley, III              Date:    January 4, 2022

Counsel for: Mountain Valley Pipeline, LLC

[ Print to PDF for Filing ]

# **TABLE OF CONTENTS**

**Page**

INTRODUCTION ............................................................. 1

STATEMENT OF JURISDICTION ............................................. 3

STATEMENT OF ISSUES ................................................... 3

STATEMENT OF THE CASE ................................................ 3

I.    Legal and regulatory background ..................................... 3

II.   Factual background .................................................. 7

      A.   FERC's environmental review ................................... 7

      B.   West Virginia's 2016-2017 Project reviews ..................... 8

      C.   Mountain Valley's response to DEP's citations ................. 10

      D.   Mountain Valley's comprehensive re-evaluation of stream
          and wetland crossings ........................................ 11

      E.   DEP's Section-401 review ..................................... 14

      F.   DEP's Section-401 certification decision ..................... 17

STANDARD OF REVIEW ................................................... 19

SUMMARY OF ARGUMENT .................................................. 21

ARGUMENT ............................................................. 24

I.    DEP considered Mountain Valley's compliance history and
    reasonably concluded that it did not stand in the way of
    certification. ..................................................... 24

II.   The Certification mandates compliance with West Virginia's
    stormwater program. ................................................ 34

III.  The Project's DEP-approved BMPs are consistent with the BMP
    Manual. ............................................................ 36

i

IV.   DEP appropriately relied on EPA's conclusions regarding BMPs
      as one of many bases for its reasonable-assurance conclusion. ............. 39

V.    DEP complied with West Virginia's antidegradation policy. ............... 42

      A.   Site-Specific preconstruction antidegradation review
           specified in West Virginia's regulations is not required for
           discharges causing temporary effects on water quality................ 44

      B.   DEP requires compliance with the Mitigation Framework,
           which documents preconstruction conditions and requires
           full site restoration. .................................................................. 49

CONCLUSION ......................................................................................... 53

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Am. Whitewater v. Tidwell*,
 770 F.3d 1108 (4th Cir. 2014) .................................................. 34

*Animal Legal Defense Fund v. Perdue*,
 872 F.3d 602 (D.C. Cir 2017) .................................................. 27

*Appalachian Voices v. State Water Control Bd.*,
 912 F.3d 746 (4th Cir. 2019) ............................................. *passim*

*Atchafalaya Basinkeeper v. United States Army Corps of Engineers*,
 894 F.3d 692 (5th Cir. 2018) .................................................. 29

*Casino Airlines, Inc. v. Nat'l Transp. Safety Bd.*,
 439 F.3d 715 (D.C. Cir. 2006) ................................................ 36

*Charter Twp. of Van Buren v. Adamkus*,
 10 F. Supp. 2d 766 (E.D. Mich. 1998) .................................... 30

*Crutchfield v. County of Hanover*,
 325 F.3d 211 (4th Cir. 2003) ............................................. 19, 39

*Natural Res. Def. Council, Inc. v. EPA*,
 16 F.3d 1395 (4th Cir. 1993) .................................................. 20

*FCC v. Prometheus Radio Project*,
 141 S. Ct. 1150 (2021) ...................................................... *passim*

*Friends of the Earth v. Hintz*,
 800 F.2d 822 (9th Cir. 1986) .................................................. 39

*Mayor of Baltimore v. Azar*,
 973 F.3d 258 (4th Cir. 2020) .................................................. 27

*Michelson v. United States*,
 335 U.S. 469 (1948) ............................................................. 30

*Mingo Logan Coal Co. v. USEPA*,
  714 F.3d 608 (D.C. Cir. 2013) .................................................. 41

*Nat'l Ass'n of Home Builders v. Defs. of Wildlife*,
  551 U.S. 644 (2007) ............................................................... 21

*Nat'l Audubon Soc'y v. Dep't of Navy*,
  422 F.3d 174 (4th Cir. 2005) ................................................... 20

*Nat'l Audubon Soc'y v. U.S. Army Corps of Eng'rs*,
  991 F.3d 577 (4th Cir. 2021) ................................................... 20

*Ohio Valley Env't Coal. v. Bulen*,
  429 F.3d 493 (4th Cir. 2005) ................................................... 29

*Ohio Valley Envtl. Coal. v. Elk Run Coal Co.*,
  24 F. Supp. 3d 532 (S.D. W. Va. 2014) .................................... 32

*Ohio Valley Envtl. Coal., Inc. v. McCarthy*,
  CA 3:15-0271, 2017 U.S. Dist. LEXIS 20392
  (S.D. W. Va. Feb. 14, 2017) .................................................... 51

*Ohio Valley Envtl. Coal. v. Pruitt*,
  893 F.3d 225 (June 20, 2018) .................................................. 51

*Sanitary Bd. of City of Charleston v. Wheeler*,
  918 F.3d 324 (4th Cir. 2019) ................................................... 21

*Sierra Club v. State Water Control Bd.*,
  898 F.3d 383 (4th Cir. 2018) ............................................ *passim*

*Sierra Club v. U.S. Army Corps of Eng'rs*,
  909 F.3d 635 (4th Cir. 2018) ................................................ 9, 37

*Sierra Club v. U.S. Army Corps of Eng'rs*,
  981 F.3d 251 (4th Cir. 2020) ................................................ 9, 41

*Sierra Club, Inc. v. United States Forest Serv.*,
  897 F.3d 582 (4th Cir. 2018) ............................................. 21, 51

*Westvaco Corp. v. EPA*,
  899 F.2d 1383 (4th Cir. 1990) ................................................. 46

iv

*Wild Virginia v. United States Forest Service*,
24 F.4th 915 (4th Cir. 2022) ................................................. 27

*Williams Gas Processing-Gulf Coast Co., L.P. v. FERC*,
475 F.3d 319 (D.C. Cir. 2006) ............................................. 36


**Statutes**

15 U.S.C. § 717f(a) ................................................................. 3

15 U.S.C. § 717n(b)(1) ........................................................... 4

15 U.S.C. § 717r(d)(1) ........................................................ 3, 10

33 U.S.C. § 1341(a)(1) ........................................................ 5, 19

33 U.S.C. § 1341(d) .............................................................. 35

33 U.S.C. § 1342(b) ............................................................... 5

33 U.S.C. § 1342(l) ................................................................ 6

33 U.S.C. § 1342(p)(2)(B) ..................................................... 46

33 U.S.C. § 1344 ................................................................... 4

42 U.S.C. § 4321, *et seq.* ......................................................... 4

W. Va. Code § 22-11-1 ........................................................... 5

W. Va. Code § 22-11-21 ......................................................... 10

W. Va. Code § 22-11-8(a) ......................................................... 5

W. Va. Code § 22-1-6(d)(7) ...................................................... 5

W. Va. Code § 22-11-7(a) ......................................................... 5


**Regulations**

18 C.F.R. § 157.21(f)(10) ......................................................... 4

18 C.F.R. § 380.9 ................................................................... 4

33 C.F.R. Part 325 ................................................................. 4

40 C.F.R. § 121.2(a)(3) (2019)................................................................24, 34

40 C.F.R. § 130.12(a)(2) ........................................................................45, 46

40 C.F.R. § 230.10 ...................................................................................... 38

40 C.F.R. § 122.26(b)(14)(x) ...................................................................... 46

40 C.F.R. § 122.26(b)(15)(i) ....................................................................... 46

40 C.F.R § 123.44 ......................................................................................... 5

40 C.F.R. Part 230 .................................................................................17, 46

47 C.S.R. § 47-5A-4.2 ................................................................................. 37

W. Va. Code R. § 47-2-4. ............................................................................ 42

W. Va. Code R. § 60-5-6.1 .............................................................. 42, 44, 49

W. Va. Code R. § 60-5-1.5.d ....................................................................47, 48

W. Va. Code R. § 60-5-3.4 ........................................................................... 43

W. Va. Code R. § 60-5-5.6.c ........................................................................ 43

W. Va. Code R. § 47-10-1, *et seq.* ................................................................ 5

W. Va. Code R. § 47-5A-1–7, *et seq.* ........................................................... 5

## Other Auhorities

*Columbia Gas Transmission, LLC*,
   170 FERC ¶ 61045 (2020) ....................................................................... 41

DEP, *Justification and Background for Permitting Guidance for Surface Coal Mining
   Operations to Protect West Virginia's Narrative Water Quality Standards, 47 C.S.R.
   2* (Aug. 12, 2010), .................................................................................. 32

Merriam-Webster ........................................................................................ 48

Letter from Secretary Caperton to DEP Staff (Nov. 13, 2017).......................... 9

NWP12 Decision Document (Jan. 4, 2021) ................................................. 42

O&G CGP Fact Sheet ..................................................................... 6

Trout Unlimited & West Virginia Rivers, *Reducing Impacts of Pipelines Crossing Rivers and Streams*, 5 (June 2020)................................................ 40

*Trunkline Gas Co.*,
94 FERC ¶ 61381 (2001) ........................................................... 41

USEPA, National Guidance Water Quality Standards for Wetlands ............ 33

USEPA, Water Quality Standards Handbook .........................................17, 33

West Virginia Rivers Coalition, *New Report: Reducing Impacts of Pipelines Crossing Rivers and Stream* (June 2020) ........................................ 40

W. Va. Dep't of Envtl. Protection, Consent Order No. 8951, Issued to Mountain Valley Pipeline, LLC (Apr. 19, 2019) ....................................... 10

W. Va. Dep't of Envtl. Protection, Consent Order No. 9925, Issued to Mountain Valley Pipeline, LLC (Dec. 17, 2020) ....................................... 10

## **TABLE OF ABBREVIATIONS**

| | |
|---|---|
| APA | Administrative Procedure Act |
| BMPs | Best Management Practices |
| Corps | U.S. Army Corps of Engineers |
| CWA | Clean Water Act |
| DEP | The West Virginia Department of Environmental Protection |
| EIS | Environmental Impact Statement |
| EPA | U.S. Environmental Protection Agency |
| FERC | The Federal Energy Regulatory Commission |
| JPA | Joint Permit Application |
| NEPA | National Environmental Policy Act |
| NGA | Natural Gas Act |
| NPDES | National Pollutant Discharge Elimination System |
| NWP12 | U.S. Army Corps of Engineers' Nationwide Permit 12 |
| O&G CGP | West Virginia state-law construction stormwater permit for oil and gas projects |
| SWPPP | Stormwater Pollution Prevention Plan |
| WVDEP | The West Virginia Department of Environmental Protection |
| WVSCI | West Virginia Stream Condition Index |

# INTRODUCTION

Section 401 of the Clean Water Act (CWA) gives States the opportunity to review federally authorized activities to certify they will not violate State water-quality standards. States need not exercise this authority at all, but when they do, they have broad discretion to decide whether and under what conditions they have "reasonable assurance" that the activity will meet State water-quality standards.

This case involves the Section-401 certification the West Virginia Department of Environmental Protection (DEP) issued for the remaining construction work in West Virginia for the Mountain Valley Pipeline project ("Project"). The Project is more than 95% complete in West Virginia—the only major construction tasks remaining are stream and wetland crossings, which require a CWA Section-404 permit from the U.S. Army Corps of Engineers (the "Corps"). Mountain Valley[1] applied for that permit in early 2021 and simultaneously requested Section-401 certification from DEP.

This was not the first time DEP would study the Project. It comprehensively evaluated the Project in 2017 in approving Mountain Valley's use of the State's general permit governing construction work for oil and gas projects (the "O&G CGP"). And it has carefully monitored Project

---

[1] Mountain Valley Pipeline, LLC.

1

construction in the intervening years.  Building on that study and experience, DEP scrutinized Mountain Valley's application and supporting information, held a public hearing, and reviewed and responded to hundreds of public comments.  During that review, the agency revisited the scientific literature evaluating the effects of the "dry open cut" construction methods Mountain Valley would use to cross streams.  It considered Mountain Valley's record of compliance with the O&G CGP to date.  And it bolstered the enhanced erosion and sediment controls and inspections already mandated by the O&G CGP with a state-of-the-art "Mitigation Framework" that ensures streams are fully restored to preconstruction conditions.  After ten months of review, DEP made a reasoned prediction that these protections, combined with a host of special conditions, would safeguard water quality going forward.

DEP's comprehensive administrative record shows that DEP more than satisfied its obligation to "reasonably consider[] the relevant issues and reasonably explain[] [its] decision."  *FCC v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021).  At every step, DEP followed the blueprint this very Court outlined in 2018 and 2019, when it rejected nearly identical challenges to the well-accepted processes States use to ensure that construction does not degrade water quality.  *See Sierra Club v. State Water Control Bd.*, 898 F.3d 383, 391–92 (4th Cir. 2018) ("*SWCB*"); *Appalachian Voices v. State Water Control Bd.*, 912

F.3d 746, 754 (4th Cir. 2019).  The Court should reach the same result here, and deny the Petition for Review.

## STATEMENT OF JURISDICTION

This Court has original jurisdiction to review the final actions of State agencies issuing authorizations for interstate natural gas pipelines pursuant to federal law.  15 U.S.C. § 717r(d)(1).

## STATEMENT OF ISSUES

Mountain Valley adopts the State Respondents' Statement of Issues.  *See* ECF No. 60 at 2–3.

## STATEMENT OF THE CASE

### I.    Legal and regulatory background

In *SWCB*, this Court described the three main elements of the overlapping system of federal and State environmental reviews for interstate natural gas pipeline projects.  898 F.3d at 387–92.

A.  The Federal Energy Regulatory Commission (FERC) has primary jurisdiction over such projects under the Natural Gas Act (NGA).[2]  It

---

[2] 15 U.S.C. § 717f(a).

3

comprehensively evaluates potential environmental effects in deciding whether to issue a "certificate of public convenience and necessity" that authorizes pipeline construction. *Id.* at 387. FERC conducts its own review under the NGA and is the lead agency in complying with the National Environmental Policy Act (NEPA).[3] Other State and federal agencies cooperate in the NEPA process, which provides a "springboard for public comment." *Id.* (internal quotation marks omitted). After reviewing and responding to public comment, FERC documents its review, frequently in an Environmental Impact Statement (EIS), and imposes conditions to minimize adverse environmental effects. *See* 18 C.F.R. §§ 157.21(f)(10), 380.9.

B. Because interstate natural gas pipelines will inevitably cross wetlands and streams, they require State and federal review under the CWA. *SWCB*, 898 F.3d at 387. Work in streams and wetlands requires a federal CWA Section-404 permit. 33 U.S.C. § 1344. And where a pipeline crosses rivers that are navigable-in-fact, they require authorization under section 10 of the Rivers and Harbors Act. *Id.* § 403. The Corps issues authorizations for both through either individual or general permits. *Id.* §§ 1344(a), 1344(e); 33 C.F.R. pt. 325.

---

[3] *See* 42 U.S.C. §§ 4321–47; 15 U.S.C. § 717n(b)(1).

4

Under CWA Section 401, a State can review applications for federal authorizations that may result in discharges to its waters and verify State water-quality requirements will be met.[4] *SWCB*, 898 F.3d at 388. DEP has broad authority over matters that affect West Virginia water quality, including Section-401 certifications. W. Va. Code §§ 22-1-6(d)(7), 22-11-7(a); W. Va. Code R. §§ 47-5A-1–7.

C. States also can regulate the potential water-quality effects of pipeline construction under State law. *See, e.g.*, *SWCB*, 898 F.3d at 391–92.

West Virginia regulates potential construction-related water-quality impacts for most projects through National Pollutant Discharge Elimination System (NPDES) permits issued pursuant to CWA Section 402. 33 U.S.C. § 1342(b). DEP uses its own Construction General Permit (CGP), which incorporates the requirements of the Water Pollution Control Act[5] and the State NPDES program rule[6] and ensures that all construction-related discharges comply with West Virginia's water-quality standards. W. Va. Code § 22-11-8(a). EPA reviews and approves the CGP through its oversight of State NPDES programs. 40 C.F.R § 123.44.

---

[4] 33 U.S.C. § 1341(a)(1).
[5] W. Va. Code § 22-11-1, *et seq.*
[6] W. Va. Code R. § 47-10-1, *et seq.*

Because the CWA exempts natural gas pipeline construction projects from Section-402 review, 33 U.S.C. § 1342(l), States cannot use their CWA programs to regulate them. *SWCB*, 898 F.3d at 391. But, like Virginia, West Virginia has filled that gap with a State-law regulatory program—the O&G CGP program. DEP follows the same procedures for issuing and authorizing use of the O&G CGP it uses for its CGP.[7] Although the O&G CGP does not require EPA approval, it mirrors the CGP in most respects.

A natural gas utility obtains coverage under the O&G CGP by submitting an application for registration and a Stormwater Pollution Prevention Plan (SWPPP). JA1930 (§ G.4.b). Like Virginia's Annual Standards & Specifications, *see SWCB*, 898 F.3d at 395, the SWPPP must describe site-specific BMPs, including structural controls and vegetative stabilization, designed to "divert flows around exposed soils, store flows or otherwise limit runoff from exposed areas and eliminate sediment-laden runoff from the site." JA1933–1936 (§§ G.4.e.2.A.i & ii). It also must include inspection and maintenance procedures "to identify and address conditions that could cause breakdowns or failures resulting in discharges of pollutants to surface waters." JA1932 (§ G.4.d.1.A); *see also* JA1937–1938 (§§ G.4.e.2.C.v & G.4.e.2.D). And, like Virginia's Standards & Specifications, the SWPPP will

---

[7] *See* O&G CGP Fact Sheet at 2, https://tinyurl.com/2p88sy5e.

include specific requirements governing instream construction. *See*, *e.g.*, JA1956–1965. A DEP-approved SWPPP has "like effect as if … set forth" in the O&G CGP, and throughout construction it must be modified as needed to ensure its effectiveness. JA1919, JA1931 (§ G.4.c), JA1937 (§ G.4.e.2).

These BMPs and monitoring requirements ensure that water flowing through construction sites, including at stream crossings, will not violate West Virginia's antidegradation policy and other water-quality standards. As EPA has concluded with respect to its own CGP, by implementing these measures, the discharge of pollutants will be "controlled as necessary to meet applicable water quality standards (which include state antidegradation requirements)." JA2113. The O&G CGP, and thus any DEP-approved SWPPP, imposes these same requirements (and more) to achieve the same result.

## II.    Factual background

### A.    FERC's environmental review

Mountain Valley applied for a FERC certificate in October 2015. FERC then scrutinized the Project's potential environmental impacts. After months of review, thousands of public comments, and hundreds of pages of analysis, FERC identified the potential for upland and instream construction to impact affected waters. *SWCB*, 898 F.3d at 392. But FERC concluded that compliance with its requirements, such as its *Wetlands and Waterbody*

7

*Construction and Mitigation Procedures* and 37 Project-specific "Environmental Conditions," would limit those impacts and result in "[n]o long-term or significant impacts on surface waters," with "[t]emporary impacts … avoided or minimized." *Id.* at 392–93. Stream crossings would cause only temporary and localized increases in turbidity, which would be "minimal compared to … natural runoff events." *Id.* at 394.

### B.    West Virginia's 2016-2017 Project reviews

In 2016, Mountain Valley applied to DEP for (1) a certification regarding the Project's use of the Corps' Nationwide Permit 12 (NWP12) for stream crossings, and (2) registration under the O&G CGP approving BMPs for instream and upland construction throughout the entire Project. After soliciting public comments on both applications, DEP issued an individual Section-401 certification in March 2017 and a registration under the O&G CGP in July 2017. JA2120–2121. DEP subsequently suspended and revisited both authorizations to address Petitioners' complaints that DEP had not fully responded to their comments, including those addressing antidegradation.

In November 2017, DEP lifted its suspension of the O&G CGP registration and, finding that it effectively minimized water-quality impacts from both instream and upland construction, notified the Corps that it would

8

waive the certification requirement for the Project's use of NWP12.[8]  DEP

issued a supplemental response to comments, comprehensively addressing

Petitioners' critiques of its previous work.  JA1636–1774.  It concluded that,

through implementation of the BMPs imposed through the SWPPP, impacts

to streams and wetlands from both upland *and instream construction* would be

temporary and insignificant.  *See, e.g.*, JA1703–1704, JA1706, JA1753,

JA1768, JA1770.  Based on these findings, DEP concluded that Project

construction would satisfy antidegradation requirements.  JA1711–1714.

Specifically,

> [C]ompliance with the [O&G CGP] will be sufficient
> to satisfy Tier 2, and the additional controls outlined
> in the SWPPP associated with this registration, which
> exceed EPA required controls to satisfy Tier 3
> antidegradation, are sufficient to not result in a
> lowering of water quality, making individualized Tier
> 2 or Tier 3 review unnecessary.

---

[8] *See* Letter from Secretary Caperton to DEP Staff (Nov. 13, 2017), https://tinyurl.com/5n745v99 ("Through its use of the [O&G CGP], WVDEP will now take full control of the inspection and enforcement of this entire project—in both upland areas and at stream and wetland crossings.").  This Court later concluded that West Virginia could not waive the individual-certification requirement.  *Sierra Club v. U.S. Army Corps of Eng'rs*, 909 F.3d 635, 639 (4th Cir. 2018) ("*Sierra Club I*").  West Virginia then modified the conditions in question, but this Court concluded that the Corps could not lawfully give effect to those modifications and directed Mountain Valley to pursue an individual permit.  *Sierra Club v. U.S. Army Corps of Eng'rs*, 981 F.3d 251, 255 n.1, 261–62 (4th Cir. 2020) ("*Sierra Club II*").

JA1713.  No party appealed.[9]

### C.    Mountain Valley's response to DEP's citations

During construction in 2018, Project areas experienced record rainfall, which taxed the system of BMPs DEP approved in 2017 and Mountain Valley's own program for ensuring compliance.  DEP cited Mountain Valley for its deficiencies, and the parties resolved all alleged violations through two negotiated consent orders.  Neither order established actual violations of water-quality standards.[10]  Pursuant to the agreements, Mountain Valley took corrective action as appropriate, instituted enhanced controls, and agreed to pay administrative penalties.  *See* JA69–70.

While Mountain Valley considers any deviation from permit requirements unacceptable, DEP's record of enforcement illustrates the system working as intended to prevent all but the "minor short term issues" that this

---

[9] DEP's approval of O&G CGP registrations are appealable to the Environmental Quality Board.  *See* W. Va. Code § 22-11-21.  Because the O&G CGP is a State-only permit, it is outside of the NGA's grant of original review jurisdiction to the federal Courts of Appeals.  *See* 15 U.S.C. § 717r(d)(1).

[10] *See* W. Va. Dep't of Envtl. Protection, Consent Order No. 8951, Issued to Mountain Valley Pipeline, LLC (Apr. 19, 2019) ("2019 Consent Order") at 12 ¶ 1, https://tinyurl.com/2hwdxbpc ("MVP does not admit to any factual and legal determinations made by the Director."); W. Va. Dep't of Envtl. Protection, Consent Order No. 9925, Issued to Mountain Valley Pipeline, LLC (Dec. 17, 2020) ("2020 Consent Order") at 15 ¶ 1, https://tinyurl.com/4cextxsm (same).

Court previously acknowledged will necessarily occur on large projects.

*SWCB*, 898 F.3d at 404–05.  Notably, none of the alleged violations of

narrative water-quality standards cited by DEP occurred at stream crossings.

*See, e.g.*, 2019 Consent Order  at 10 ¶ 23 (citing Mountain Valley for O&G

CGP, not water quality, violation at stream crossing).  Moreover, the alleged

violations significantly decreased after the 2019 order.  *Compare* 2019 Consent

Order, Base Penalty Calculation at 3 (alleging 37 violations of narrative

standards over seven months) *with* 2020 Consent Order, Base Penalty

Calculation at 3 (alleging eight violations over 20 months).  And DEP later

determined that MVP addressed all "noncompliance … immediately," and

none of the citations resulted in significant water quality or ecosystem impacts.

JA9, JA69.

### D.    Mountain Valley's comprehensive re-evaluation of stream and wetland crossings

This Court's *Sierra Club II* decision meant Mountain Valley would lack

CWA authorization to work in streams and wetlands for many months.

Mountain Valley briefly explored the feasibility of completing all stream and

wetland crossings for the first 77 miles of the Project in a way that would avoid

need for Corps Section-404 authorization.  It applied to FERC for

authorization to change construction methods, but withdrew its application

11

after closer study revealed insuperable engineering obstacles and heightened environmental risk.  FERC never acted on it.

Mountain Valley then submitted a comprehensive joint permit application (JPA) seeking an individual permit from the Corps and providing information to support State water-quality certification reviews.  Central to the JPA was a comprehensive re-assessment of each individual stream and wetland crossing and the practicability of executing each crossing using a trenchless method.  JA1384 (§ 5.1.1).  A multi-disciplinary team of scientists and consultants re-evaluated the assumptions that informed its previous analyses.  They drew on the company's greater familiarity with the Project area and its successful experience using trenchless methods to complete numerous crossings between late 2018 and early 2021.  JA1608–1613.  This analysis benefitted from real-world cost figures for the alternative construction methods and a more refined understanding of the features at each location.  JA1608–1613.  Ultimately, Mountain Valley concluded it could use trenchless methods for 38 of 193 remaining crossings in West Virginia.  JA56.  That trenchless-crossing utilization rate (more than 20%) exceeds by a factor of four the rate for recent FERC-certificated natural gas pipeline projects.  JA1618–1635.

12

Mountain Valley presented this comprehensive analysis in the JPA. In section 5.1.1, Mountain Valley:

- summarized available crossing methods and the logistical limitations of each;

- described the site-specific factors that bear on the choice of method;

- compared the environmental effects of open cuts against those of trenchless crossings; and

- summarized how it evaluated those factors to arrive at its decision.

JA1384–1398. Tables 2 and 3 report relevant data on each proposed impact site, including the nature of the resources, the scope and type of impact, and whether any sensitive species may be present. JA1436–1455. Table 12 documents the size of potential soil piles from bore bits and other logistical constraints associated with a hypothetical trenchless crossing of each resource. JA1456–1467. Tables 13 and 14 compile information on anticipated costs for dry open-cut and trenchless crossings, respectively. JA1468–1469. Table 15 summarizes the crossing-method determination for each crossing, and Figure 4 presents, for each crossing location, a topographical map overlaying a satellite image that shows the Project route, the limits of the right-of-way, the location of streams and wetlands, and the presence of other features that could

13

constrain construction alternatives.  *See*, *e.g.*, JA1470–1518 (Table 15), JA1519–1528 (Figure 4 map examples).

### E.    DEP's Section-401 review

DEP scrutinized Mountain Valley's certification request and supporting information in the JPA over the course of ten months.  The agency solicited public input and held a hearing in June 2021.  JA3.  Thereafter, it reviewed and responded to hundreds of written and oral public comments.  JA3.  These included comments from EPA,[11] which questioned Mountain Valley's selection of crossing methods.

Mountain Valley provided DEP with extensive supplemental information to address the public and EPA comments.  JA1605–1617, JA1129.  Agency reviewers formally met with Mountain Valley multiple times to discuss aspects of the request, including the crossing methodologies summarized in JPA Table 15.  DEP also reviewed "an extensive body of literature on the effectiveness of" dry open-cut construction techniques, and drew confidence from FERC's approval of such techniques.  JA9, JA20.

DEP also reviewed the *Stream and Wetland Mitigation Framework* (the "Mitigation Framework"), which Mountain Valley developed based on

---

[11] JA1064–1072.

14

substantial input from State and federal reviewers.[12]  The Mitigation

Framework imposes robust obligations to ensure the Project's instream

activities do not cause violations of water-quality standards.  JA126–345.  The

Mitigation Framework consists of six core elements:

1. Baseline Assessment Requirement.  Mountain Valley must

    thoroughly document the pre-crossing condition of planned stream

    and wetland crossings.  *See* JA139–159.  This site-specific data

    includes water-quality data, habitat information, vegetation

    characteristics, soil analyses, photographs, and topographical surveys.

    Mountain Valley has already collected this data and submitted it to

    DEP.  *See, e.g.*, JA355–736 (baseline assessments for streams in

    Braxton, Doddridge, and Greenbrier Counties).

2. Restoration Work Plan.  Using the information collected as part of

    the Baseline Assessment, Mountain Valley must develop site-specific

    work plans to guide the restoration of each crossing location.  And

    Mountain Valley must engage environmental inspectors to actively

    monitor construction and restoration and direct work crews to

    promptly correct any deviations from the site-specific plans.  JA208–

    218.

---

[12] *See* JA9–10 (describing Mitigation Framework).

3. <u>Performance Standards</u>.  Using data from the Baseline Assessment, DEP imposes measurable goals to ensure a stream or wetland has been successfully restored to its preconstruction condition.  The performance standards are tailored to each stream and wetland using data from the Baseline Assessment.  JA272–282.

4. <u>Monitoring Plan</u>.  Mountain Valley must monitor each restored stream and wetland for a period of three years after construction.  For each annual monitoring period, it must collect the same comprehensive suite of site-specific data collected for the Baseline Assessment, which will be used to determine whether the performance standards are being met.  Annual monitoring reports will be submitted to both the Corps and DEP.  JA283–292.

5. <u>Maintenance and Adaptive Management</u>.  If monitoring demonstrates that a restored stream or wetland is not meeting performance standards, Mountain Valley must identify the cause and propose corrective action as appropriate to DEP and the Corps. JA293–304.

6. <u>Supplemental Credit Determination Methodology</u>.  Even though restoration is typically the only mitigation method prescribed for temporary construction impacts, the Mitigation Framework requires

16

Mountain Valley to supplement its mitigation credits based on the duration of temporary impacts.[13]  This supplemental mitigation provides additional assurance that the goal of "no net loss" will be achieved if there are delays in achieving the performance standards.  JA305–315.

### F.  DEP's Section-401 certification decision

On December 30, 2021, after ten months of review, DEP issued its water-quality certification for the Project's proposed Corps permits, along with a comprehensive decision document and full response to comments.  Like Virginia in 2017, DEP relied on its previous study of the Project, but it did not stop there.

DEP's decision provides a detailed survey of the Project and the regulatory framework that governs West Virginia water-quality certifications.  JA3–6.  In particular, it explains how West Virginia's O&G CGP, like EPA's

---

[13] The use of mitigation to ensure that impacts remain insignificant is consistent with the "avoidance, minimization and compensation" sequence codified by EPA and the Corps at 40 C.F.R. Part 230 for evaluating and permitting discharges of dredged or fill material.  *See* USEPA, Water Quality Standards Handbook, §§ 4.4 (planned activities that lower water quality so that uses are not protected are inconsistent with antidegradation policy and "planned activity must be avoided or *adequate mitigation* … must be taken" to protect uses) & 4.43 (EPA interprets antidegradation policy as satisfied for fills where discharge does not result in "significant degradation" under the § 404(b)(1) Guidelines), available at https://tinyurl.com/2p8cyz2b.

17

CGP, "relies on engineering controls and adaptive management processes to control sediment and its constituents," and how implementation of the O&G CGP and the "instream BMPs" outlined in DEP's BMP Manual "will result in compliance with standards for surface water discharges from construction sites." JA5–6. DEP also endorsed Mountain Valley's assessment regarding the practicability of trenchless crossings, JA55–57, and explained that compliance with the Mitigation Framework will supply an additional backstop for water-quality protection. JA9–10.

In its decision, DEP considered and explained Mountain Valley's compliance history. It reviewed extensive documentation of the pre- and post-construction conditions at all waterbody crossings where past violations occurred. JA69. DEP observed that its enforcement group "found no significant adverse effects at the stream crossings where MVP conducted work," JA9, that the "overwhelming majority" of the violations were not "associated with *any* aquatic impacts," and "none alleged … any significant adverse impacts to the aquatic ecosystem…," JA69. The agency also noted Mountain Valley's "immediate[ ]"and effective responses to all prior infractions. JA69, JA72. In light of this review, DEP rejected commenters' claim that MVP's compliance record "demonstrate[s] that discharges from the Project will not comply with water quality standards." JA69.

Ultimately, DEP concluded that "[t]he combination of the O&G CGP, enhanced erosion and sediment controls, frequent WVDEP inspections, and the Mitigation Framework will enable the USACE-regulated activities to comply with water quality standards" and "prevent any significant degradation of regulated waters." JA10. DEP then imposed 31 special conditions—many requiring compliance with the Mitigation Framework—that erect yet another defense against "the potential for any water quality degradation." JA9, JA14–19.

## STANDARD OF REVIEW

State agencies exercise broad discretion when certifying activities under Section 401. *Appalachian Voices*, 912 F.3d at 754 (citing 33 U.S.C. § 1341(a)(1)). This Court reviews certifications under the highly deferential "arbitrary and capricious" standard, *id.* at 753, which forbids a court from "substitut[ing] its own policy judgment for that of the agency," *Prometheus Radio Project*, 141 S. Ct. at 1158. That deference is particularly appropriate "with environmental statutes … [where] the regulatory framework is exceedingly complex and requires sophisticated evaluation of complicated data." *Crutchfield v. County of Hanover*, 325 F.3d 211, 218 (4th Cir. 2003) (internal quotation marks omitted).

Indeed, the Court is at its most deferential when agency action involves "complex predictions within the [agency]'s area of special expertise." *Nat'l Audubon Soc'y v. U.S. Army Corps of Eng'rs*, 991 F.3d 577, 583 (4th Cir. 2021). Accordingly, the Court does not "sit as a scientific body" in such cases, "meticulously reviewing all data under a laboratory microscope." *Id.* (quoting *Natural Res. Def. Council, Inc. v. EPA*, 16 F.3d 1395, 1401 (4th Cir. 1993). Nor may courts "'flyspeck' an agency's environmental analysis, looking for any deficiency, no matter how minor." *Nat'l Audubon Soc'y v. Dep't of Navy*, 422 F.3d 174, 186 (4th Cir. 2005). Instead, the Court "simply ensures that the agency has acted within a zone of reasonableness and, in particular, has reasonably considered the relevant issues and reasonably explained the decision." *Prometheus Radio*, 141 S. Ct. at 1158.

Applying this standard, a court may set aside agency action as arbitrary or capricious only where the agency:

1. "has relied on factors which [the Legislature] had not intended it to consider";

2. "*entirely* failed to consider an important aspect of the problem";

3. "offered an explanation for its decision that runs counter to the evidence before [it]"; or

4. "is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."

20

*Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 658 (2007)

(emphasis added).  Conversely, an agency's action should *not* be set aside

because the agency might have "explore[d] a subject more deeply … [or]

discuss[ed] it more thoroughly." *Sierra Club, Inc. v. United States Forest Serv.*,

897 F.3d 582, 597 (4th Cir. 2018).[14]  Nor should an agency's decision be set

aside if it is of "less than ideal clarity," so long as "the agency's path may

reasonably be discerned." *Sanitary Bd. of City of Charleston v. Wheeler*, 918 F.3d

324, 333 (4th Cir. 2019) (citation omitted).

## SUMMARY OF ARGUMENT

1.    DEP considered Mountain Valley's compliance record and

reasonably concluded it did not justify denying the certification.  The agency

acknowledged past citations, reviewed detailed documentation of impacts at

waterbody crossings, explained the severity of alleged violations, discussed

contributing factors, and noted Mountain Valley's consistent record of

promptly addressing identified issues.  Based on this review, DEP reasonably

concluded that Mountain Valley's construction activities would not violate

State water-quality standards.  That decision is owed deference and was

neither arbitrary nor capricious.

---

[14] *See also Prometheus Radio*, 141 S. Ct. at 1160 ("The APA imposes no general obligation on agencies to conduct or commission their own empirical or statistical studies.").

2.    DEP appropriately declined to stipulate compliance with the O&G CGP and SWPPP as a standalone condition of the certification.  The CWA and associated regulations require only that a State "set forth any … limitations" it "deems necessary or desirable" to protect water quality.  DEP satisfied that obligation on multiple levels.  First, it exercised its broad discretion in finding it neither "necessary" nor "desirable" to specifically repeat pre-existing legal requirements in a separate condition.  Second, the agency in fact "set forth" compliance with the O&G CGP and SWPPP throughout the certification document, including by mandating that Mountain Valley follow the Mitigation Framework in special condition 26.

3.    DEP mentioned in its decision document that the types of measures Mountain Valley will employ for the Project are "consistent with" its BMP Manual.  Because that observation merely supplements DEP's core reasons for concluding that approved engineering practices will effectively control sediment, the certification does not rise or fall on consistency with the Manual.  In any event, the Manual specifically disclaims strict adherence to its recommendations and does not mandate the use of trenchless crossing methods in all circumstances, especially given Mountain Valley's comprehensive and credible explanation for why trenchless crossings would be

22

impracticable at some locations.  Petitioners also waived this argument by
failing to present it during the administrative process.

4.     DEP cited EPA's CGP for the settled proposition that using BMPs
to divert running water from disturbed construction areas—combined with
regular inspection and monitoring—will protect water quality.  The agency's
minimal reliance on EPA's judgment as one of several lines of evidence
supporting this conclusion was neither arbitrary nor capricious.

5.     The type of location-specific antidegradation review Petitioners
say DEP should have conducted is not required where the activity's effect on
water quality is only temporary.  And by mandating BMPs, frequent
inspection, and compliance with the Mitigation Framework, DEP reasonably
concluded that the Projects effects on water quality would only be temporary.

Petitioners' contention that, because stream crossings involve point-
source discharges, "more is required" to comply with antidegradation is simply
wrong.  EPA considers the discharges it regulates under its own CGP to be
point-source discharges, and EPA is subject to regulations governing
antidegradation review nearly identical to West Virginia's.  EPA nonetheless
relies on the use of BMPs to ensure water-quality effects are temporary and
insignificant and thus satisfy antidegradation requirements.  Petitioners never
bother to say what more DEP should have required.

23

**ARGUMENT**

To certify the Project under CWA Section 401, DEP must develop "reasonable assurance" that Mountain Valley's construction activities "will be conducted in a manner which will not violate water quality standards." 40 C.F.R. § 121.2(a)(3) (2019). Petitioners do not dispute that DEP made the requisite finding here, but they question its adequacy. Pet'rs' Br. at 30. Petitioners' critiques fail in the face of DEP's robust analysis, which fully accounts for Mountain Valley's compliance history and relies on the exact same water-quality protections that this Court affirmed in *SWCB* and *Appalachian Voices*—"tried and true" engineering controls, extensive monitoring, special conditions, and a supplemental Mitigation Framework that goes above and beyond legal requirements. DEP "reasonably considered the relevant issues and reasonably explained [its] decision"—its comprehensive review of the Project falls well within the APA's "zone of reasonableness." *Prometheus Radio*, 141 S. Ct. at 1158.

## I.    DEP considered Mountain Valley's compliance history and reasonably concluded that it did not stand in the way of certification.

Premised entirely on context-stripped phrases from the record, Petitioners first argue that DEP's reasonable-assurance decision was arbitrary and capricious because it "disregarded" Mountain Valley's compliance history. Pet'rs' Br. at 30–31. The full record tells a different story.

24

Far from "disregarding" previous infractions, DEP acknowledged, reviewed, and explained Mountain Valley's compliance history at multiple places in the record, and reasonably concluded that it did not automatically doom certification. The agency first recognized the "minor violations" that occurred in 2018—after "inspectors evaluated Project work multiple times per week and conducted dozens of investigations"—and clarified that its enforcement group "found no significant adverse effects at the stream crossings where MVP conducted work." JA9. In fact, the "overwhelming majority" of the violations were not even "associated with any aquatic impacts." JA69. DEP also listed several factors that place the past violations in context, including (1) "the size of the project," (2) "the unusual length of time that the Project has remained incomplete and areas have been left unrestored (due to litigation-related delays)," (3) the frequency of inspections, and (4) the agency's responsiveness to "numerous citizen complaints (including some [by] commentors)" alleging violations. JA69–70.

DEP reviewed extensive documentation of the pre- and post-construction conditions at all waterbody crossings, including those where past violations occurred. JA69. That documentation, "which include[d] photographs taken before construction and after restoration," "showed well-established vegetative growth and a return to pre-construction contours at each

25

location, and *no evidence of any lasting impacts*." JA69 (citing Att. 2 of Mountain Valley's Resp. to USACE Aug. 30, 2021, Request for Information, JA1532–1601) (emphasis added).

Finally, DEP noted Mountain Valley's effective responses to past violations: "MVP ... provided a timely written response describing measures taken to address the issues identified and documenting (with photographs) these efforts." JA69. And it found that "[a]ll noncompliance was addressed" by Mountain Valley's "immediate[]" actions. JA69; *see also* JA72 ("MVP has worked with the environmental enforcement program at WVDEP to resolve any and all notices of violation.").

After considering all of this evidence in the context of the suite of protective measures required by the certification, DEP explained that this history did not "demonstrate that discharges from the Project will not comply with water quality standards." JA69. Its study of past citations convinced it that "MVP's compliance history does not suggest that the remaining construction will result in significant aquatic impacts amounting to a violation of water quality standards." JA69–70.

DEP's full analysis of Mountain Valley's compliance history separates this case from *Wild Virginia v. United States Forest Service*, where the Court held that the agencies "*entirely failed* to consider an important aspect of the problem"

26

by ignoring certain real-world data. 24 F.4th 915, 928 (4th Cir. 2022)

(emphasis added). Here, DEP embraced that data. It also distinguishes it

from *Mayor of Baltimore v. Azar*, where the agency never "articulate[d] a

satisfactory explanation for its action." 973 F.3d 258, 275 (4th Cir. 2020).

And, unlike the agency in *Animal Legal Defense Fund v. Perdue*, DEP did not

"rel[y] on facts" it knew were false "*at the time*" it relied on them. 872 F.3d

602, 619 (D.C. Cir 2017) (emphasis added). Instead, DEP reasonably relied

on the O&G CGP, enhanced engineering controls, monitoring, certification

conditions, and the Mitigation Framework to support reasonable assurance of

*future* compliance. JA10.

Petitioners nevertheless deduce (at 31) an "internal inconsistency" in

DEP's reasoning: that it "assumes *both* (1) MVP will violate the [O&G CGP]

and water quality standards *and* (2) MVP's compliance with the [O&G CGP]'s

requirements will assure compliance with water quality standards." But DEP

*does not* assume that Mountain Valley will violate the O&G CGP or water-

quality standards—the record shows that DEP assumes just the opposite. *See*

JA2 ("[T]here is reasonable assurance that the activity will be conducted in a

manner that does not violate water quality standards."); JA10 (concluding that

the Project's multi-layered approach will "comply with water quality

standards"); JA69 (rejecting the proposition that "past violations of the O&G

CGP demonstrate that discharges from the Project will not comply with water quality standards"). And to the extent that DEP's statement that "it does not regard the number of [*past*] violations ... as surprising" contemplates *the possibility* of unforeseen problems with the O&G CGP, such problems would not translate directly to *water-quality* violations because the O&G CGP and water-quality standards are distinct. Indeed, the O&G CGP intentionally sets a high bar in order to *ensure* water-quality protection. *See* JA1920.

At bottom, the inconsistency Petitioners perceive is little more than a cynical description of "adaptive management," a concept this Court and the EPA fully endorse. *SWCB*, 898 F.3d at 404; JA5 (quoting USEPA 2017 Construction General Permit—Fact Sheet, § VI, Part 3.1 p. 51). Under the O&G CGP's adaptive-management approach, the anticipation and identification of "short-term issues" are a feature—not a bug—that allows project managers to identify unforeseen problems and improve protections.[15] JA5 ("[T]he permit is not static. It requires ... corrective measures where ... the permit is not meeting standards." (quoting EPA Construction General Permit—Fact Sheet)). As this Court explained in *SWCB*, a State agency may

---

[15] As described above (at 16), the Mitigation Framework incorporates a separate Adaptive Management Plan focused on streams and wetlands that will function in concert with the adaptive management provisions of the O&G CGP.

28

reasonably "use the tools at its disposal to adjust to any unexpected contingencies that may lead to a short-term exceedance," 898 F.3d at 404, especially in the case of "large construction projects," where "it must be anticipated" "that unexpected problems will arise, leading at least to minor, short-term issues," *id.* at 405. Petitioners' restrictive interpretation would prevent DEP from certifying any project seeking to reap the benefits of such common-sense controls—and, more generally, set a legal trap for well-intentioned State agencies attempting to protect their waters by taking advantage of best practices.

Petitioners (at 33) say *SWCB* can be distinguished, because Mountain Valley "was a new company" then, and Virginia's reasonable-assurance finding "was thus 'inherently predictive.'" But *all* reasonable-assurance certifications are inherently predictive. "[I]t is impossible for ... *ex ante* determinations of ... impact to be anything more than reasoned predictions." *Ohio Valley Env't Coal. v. Bulen*, 429 F.3d 493, 501 (4th Cir. 2005). Petitioners' reductive approach jettisons "reasoned prediction" in favor of pre-judgment based on past transgressions. That position not only contradicts the case law— *see Atchafalaya Basinkeeper v. United States Army Corps of Engineers*, 894 F.3d 692, 703 (5th Cir. 2018) (affirming decision to issue a CWA permit to a pipeline company despite "an alleged history of noncompliance"); *Charter Twp. of Van*

29

*Buren v. Adamkus*, 10 F. Supp. 2d 766, 770 (E.D. Mich. 1998) (considering noncompliance history before issuing permit)—it offends basic principles of due process, *see, e.g.*, *Michelson v. United States*, 335 U.S. 469, 476 (1948) (observing that prior-act evidence "weigh[s] too much" and "so overpersuade[s] [the factfinder] as to prejudge one with a bad general record and deny him a fair opportunity to defend against a particular charge").

Petitioners next argue (at 34), citing a single phrase from the record, that DEP applied the wrong legal standard when it explained that none of Mountain Valley's *past* citations "alleged any significant adverse impacts to the aquatic ecosystem." They say DEP focused "not on whether MVP *will violate* water quality standards, but on the *severity* of such violations." *Id.* (emphasis original). Petitioners are mistaken. In reality, DEP *did focus* on whether Mountain Valley will violate water-quality standards in part *by considering* the severity of the effects of *past* citations.

DEP applied the correct standard for this certification, concluding that it had reasonable assurance that water-quality violations—however significant—will not occur in the future. *See* JA2, JA10, JA69. It rested that conclusion primarily on Mountain Valley's implementation of time-tested engineering controls, extensive monitoring, special conditions, and a supplemental

Mitigation Framework that includes a complementary suite of monitoring and adaptive management requirements.  JA10.

DEP nowhere condoned actual-but-insignificant water-quality violations.  Instead, it simply explained that Mountain Valley's *past* citations were for "minor" infractions that produced no "lasting impacts."  JA9, JA69.  The severity of past citations was certainly a relevant consideration in the Section 401 analysis, one that added perspective and suggested that the enhanced protections the certification stipulates will prevent future violations.

Indeed, DEP's explanation of past citations represents a strength—not a flaw—of the decision.  Read in conjunction with the agency's full discussion of Mountain Valley's compliance history—which examines numerous factors that contributed to past violations, Mountain Valley's prompt responses, and extensive evidence of *no impacts at stream crossings*—DEP's explanation evidences the path the agency traversed to gain "reasonable assurance" that the same alleged violations will not automatically occur in the future.  JA9, JA69.  Engaging in that discussion supports rather than hurts DEP's decision under the APA.

In all events, even if Petitioners' argument did not hinge entirely on a false premise, it remains far from clear that DEP interprets its narrative water-quality standards as "rigidly" as Petitioners do.  *See SWCB*, 898 F.3d at 405

("Were Virginia's policy interpreted as rigidly as Petitioners suggest, no project affecting Tier 2 waters could ever be approved without an economic/social development need analysis.").  Contrary to Petitioners' description of the regulatory framework (at 9 & n.3), DEP has suggested that *all* narrative water-quality violations require a showing of "significant adverse impact" to the aquatic environment.[16]  That guidance repeatedly refers to "significant adverse impact" in discussing the narrative criterion at subsection 47-2-3.2.e, even though that phrase appears only in subsection 3.2.i.  *Id.*

The only court to consider the issue agrees with that interpretation.  *See Ohio Valley Envtl. Coal. v. Elk Run Coal Co.*, 24 F. Supp. 3d 532, 545 (S.D. W. Va. 2014).  There, the court rejected a "literal reading" of the narrative standards that would lead to violations for "any wastes which materially contribute to even the most miniscule harm."  *Id.*  To avoid that "absurdity," and because of "the grammatically distinct structure of" subsection 3.2.i, it read 3.2.i's "no significant adverse impact" requirement to apply to the previous subsections in that regulation.  *Id.*

---

[16] DEP, *Justification and Background for Permitting Guidance for Surface Coal Mining Operations to Protect West Virginia's Narrative Water Quality Standards, 47 C.S.R. 2 §§ 3.2.e and 3.2.i*, 3 (Aug. 12, 2010), https://tinyurl.com/mvd3dhm9.

32

DEP's guidance and the *Elk Run* court's analysis also overlap with EPA's use-oriented approach to narrative water-quality standards. For example, in providing sample narrative water-quality criteria, EPA's Water Quality Standards Handbook states that "waters shall be free from ... polluting substances *in amounts that will prevent attainment of the designated uses specified.*"[17] And EPA has elsewhere stated that "[n]arrative criteria are general statements designed to protect a specific designated use or set of uses" and "are used to identify impacts to designated uses"—not to outlaw temporary exceedances producing no impact on the waterbody.[18]

And all of this squares with the pragmatic approach to water quality that this Court ratified in *SWCB*. *See* 898 F.3d at 405 (rejecting the argument that "even quick adjustments by DEQ to minor exceedances would necessarily be insufficient to 'maintain[ ] and protect[ ]' Tier 2 water quality."). Petitioners (at 35–36) attempt to distinguish *SWCB* by arguing that the "exceedances" it referenced were exceedances of baseline conditions. But the Court's discussion of water quality—rather than the later section Petitioners cite—refers to "sampling results 'that *exceed the applicable water quality criteria*,'" not

---

[17] USEPA, Water Quality Standards Handbook, Ch. 3 at 5, available at https://tinyurl.com/yckk9w7d (emphasis added).

[18] USEPA, National Guidance Water Quality Standards for Wetlands, § 4.1, available at https://tinyurl.com/2zzdhdnx.

baseline data.  898 F.3d at 404 (emphasis added).  In either case, there is no

question that the *SWCB* Court flatly rejected the same strict-liability approach

to narrative standards that Petitioners advocate here.  898 F.3d at 405.

    In light of all of these authorities, DEP acted well within its discretion

when it considered the severity of *past* violations in making its reasonable-

assurance determination about *future* compliance.  In the end, DEP examined

and explained Mountain Valley's compliance history, and made a "reasoned

prediction" that it did not "demonstrate that discharges from the Project will

not comply with water quality standards."  JA69.  Petitioners "disagree[] with

the outcome" of DEP's analysis, but their complaints amount to little more

than the kind of "second-guessing" that the APA disallows.  *Am. Whitewater v.*

*Tidwell*, 770 F.3d 1108, 1116 (4th Cir. 2014).

## II.  The Certification mandates compliance with West Virginia's stormwater program.

    DEP committed no error by choosing not to explicitly stipulate

compliance with the O&G CGP and SWPPP as a standalone condition in

attachment A of its decision document.  The CWA requires only that the

agency "set forth" any conditions that it "deems necessary or desirable" to

ensure compliance with water-quality standards.  33 U.S.C. § 1341(d); 40

C.F.R. § 121.2(a)(3) (2019).  DEP satisfied that requirement on multiple levels,

34

especially in light of the "broad discretion" State agencies enjoy in developing certification conditions. *Appalachian Voices*, 912 F.3d at 754.

Petitioners manufacture a problem here by magnifying a non-existent risk of preemption. Their argument fails for the reasons the State Respondents already have identified: the CWA does not require a State to include legally redundant conditions in Section-401 certifications, and FERC already has required Mountain Valley to comply with State requirements. *See* ECF No. 60 at 33–37.

But Petitioners' argument fails for a more fundamental reason—their claim (at 37) that DEP "failed to make compliance with the [O&G CGP] or SWPPP a condition of the certification" is simply wrong. Condition 26 mandates that the "Stream and Wetland Mitigation Framework shall be followed." JA18. The Mitigation Framework, in turn, requires compliance with the O&G CGP and associated SWPPP: "*[E]very person* employed on the Project and participating in stream and wetland crossings and other activities that impact aquatic resources" must "[c]omply with all legal, regulatory, and permit requirements at all times, without exception," including DEP's "Water Pollution Control Act Permit for Construction" and "Erosion and Sediment Control Plans." JA210–212 (emphasis original). Thus, DEP in fact

35

"enshrined," via the Mitigation Framework, compliance with the O&G CGP
and SWPPP in the special conditions section of the certification.

## III. The Project's DEP-approved BMPs are consistent with the BMP Manual.

DEP notes correctly that the types of measures Mountain Valley will
employ for the Project are "consistent with" those described in the agency's
BMP Manual. JA7. Petitioners (at 39–47) have scoured the Manual and
extra-record sources to sow doubt about that passing observation. But
ultimately their quibbles get them nowhere.

Petitioners' contentions regarding DEP's reference to the BMP Manual
fail for the reasons State Respondents have identified. The BMP Manual is
guidance, not law, and it invites departure from its general prescriptions. *See*
ECF No. 60 at 37–42. And DEP's site specific evaluation of the Project's
stream crossings show that, unlike the agency in the case on which Petitioners
(at 40) chiefly rely, DEP "clearly would have acted" on the controls approved
in the O&G CGP and SWPPP, as supplemented by the Mitigation
Framework, "even if" those controls were not consistent with every single
provision of the Manual. *Williams Gas Processing-Gulf Coast Co., L.P. v. FERC*,
475 F.3d 319, 330 (D.C. Cir. 2006) (quoting *Casino Airlines, Inc. v. Nat'l Transp.
Safety Bd.,* 439 F.3d 715, 717–18 (D.C. Cir. 2006)). Consistency with the BMP
Manual merely supplements the core rationales supporting DEP's finding that

36

approved BMPs will effectively control sediment.  *See* JA10 (omitting reference to the Manual in "combination of" key reasons for certification).

Petitioners' use of the BMP Manual as a springboard to attack Mountain Valley's evaluation of the practicability of trenchless crossings is also flawed. As explained above (at 11–13), Mountain Valley comprehensively described is reasons for rejecting trenchless crossings at some locations as impracticable. DEP closely scrutinized that work, which exceeded the demonstration required under DEP regulations,[19] and responded to comments criticizing it. JA56–57.

Petitioners identify no flaw in that analysis or any specific open-cut crossing for which Mountain Valley should have used a trenchless method. Instead, they attack Mountain Valley for doing precisely what Petitioners have urged Mountain Valley to do for years[20] and say DEP should have scrutinized Mountain Valley's analysis more closely.

---

[19] DEP regulations require a general "alternatives analysis," 47 C.S.R. § 47-5A-4.2, but they do not include a "least environmentally damaging practicable alternative" standard.  For "Surface Mining Operations," regulations require a "No Practical Alternative Demonstration," *id.* § 47-5A-4.2.f, but that provision is inapplicable here.

[20] *See, e.g.*, Pet'rs' Final Opening Br. at 36–37 & n.3, ECF No. 99, Pet'rs' Final Reply Br. at 22–24 & n.5, ECF No. 100, *Sierra Club I*, 909 F.3d 635 (No. 18-1173(L)).

Petitioners' attacks on Mountain Valley's credibility are cynical and misplaced. In preparing the JPA, Mountain Valley comprehensively reassessed its approach to executing stream crossings. *Supra* at 11–13. Instead of examining crossing techniques in gross, the company went site by site through each of 432 locations. And it did so with the benefit of experience in the field using trenchless techniques, which demonstrated the company's earlier pessimism about boring was at least partially misplaced. JA1608–1613. Of course this new approach yielded different results, and Petitioners challenge none of those individual determinations.

Petitioners also lift from context (at 43–44) Mountain Valley's statements made as part of its exploration of the possibility to complete the first 77 miles of the Project without any jurisdictional impact. That exercise assumed that dry open-cut crossings were unavailable,[21] so it did not apply the Corps' avoidance and minimization requirements at 40 C.F.R. § 230.10 that provided the analytical framework presented in the JPA. Petitioners gloss over this important distinction to wrongly suggest Mountain Valley's statements about the suitability of conventional bores compared to other trenchless

---

[21] *See, e.g.*, JA998 (explaining that "Mountain Valley considered the possibility of using trenchless crossing methods other [than] conventional bore for the wetlands and waterbodies between MPs 0 and 77 ... [but] concluded that the use of other trenchless methods is not warranted" due to conventional bore's suitability).

methods reflects a judgment about the *practicability* of bores compared to open cuts under the Corps' regulations.

And, in all events, Petitioners unfairly diminish DEP's work.  Far from "blindly accepting" Mountain Valley's submissions, DEP evaluated those submissions, considered supplemental information, participated in follow-up meetings with Mountain Valley and the Corps, and reviewed public comments.  Based on this thorough evaluation, it explained why it considered the analysis of construction alternatives sufficient.  JA3–4.  Mountain Valley certified the accuracy of that information, and DEP was entitled to rely on it. *Crutchfield*, 325 F.3d at 223–24 (rejecting district court conclusion that Corps had obligation to conduct independent studies rather than rely on extensive studies provided by an applicant); *see also Friends of the Earth v. Hintz*, 800 F.2d 822, 835 (9th Cir. 1986) (finding actions like those taken by DEP sufficient to fulfill "obligation to independently verify [applicant-provided] information").

## IV.   DEP appropriately relied on EPA's conclusions regarding BMPs as one of many bases for its reasonable-assurance conclusion.

DEP relied on multiple, independent lines of evidence to conclude that the use of well-accepted BMPs would protect water quality.  DEP conducted its own review of the academic literature, which shows that "dry open-cut" construction techniques effectively ensure any increased sedimentation from instream construction will be temporary and/or insignificant.  JA9, JA20,

39

JA57–60.  DEP also relied on its own previous reviews of dry open-cut techniques in certifying the Corps' NWP12, where it reached similar conclusions.  JA59.  And DEP participated as a cooperating agency in the preparation of an EIS, wherein FERC found that Project BMPs would protect water quality.  *Supra* at 7–8.

The effectiveness of dry open-cut techniques is uncontroversial.  Indeed, in June 2020, Petitioner West Virginia Rivers Coalition co-authored a "deep dive into the various methods pipeline companies use to cross rivers and streams."[22]  There, the authors examined the efficacy of different waterbody-crossing techniques, including dry-cut methods such as "flumes," "dam and pump," and "coffer dams."[23]  In each case, their report notes that an advantage of these techniques is that "there is minimal release and transport of sediment downstream."[24]

DEP assigned negligible (if any) weight to whether EPA's CGP imposes instream controls.  DEP cites EPA's conclusions for the unexceptional

---

[22] *See* West Virginia Rivers Coalition, *New Report: Reducing Impacts of Pipelines Crossing Rivers and Stream* (June 2020), https://tinyurl.com/mst8a457.

[23] Trout Unlimited & West Virginia Rivers, *Reducing Impacts of Pipelines Crossing Rivers and Streams*, 5 (June 2020), https://tinyurl.com/ynjjvjvz. (acknowledging that dry open-cuts involve "minimal release and transport of sediment downstream ... [and] [are] not likely to result in negative effects to fish and fish habitat.").

[24] *Id.*

40

proposition that the use of appropriate BMPs to divert running water from disturbed construction areas, coupled with regular inspection and maintenance, will protect water quality. JA5, JA61. Even Petitioners agree with that. DEP also cites EPA's CGP in describing the conclusions it reached both in issuing the O&G CGP and authorizing Mountain Valley to rely on it. JA7, JA9, JA10–11, JA55–56, JA63, JA65–66, JA67–68. But DEP emphasizes that it is relying on its own conclusions in that Project-specific review, which unquestionably evaluated instream controls. Petitioners did not challenge those findings and cannot collaterally attack them here.[25]

Petitioners observe (at 48–49) that, at the federal level, the Corps regulates instream work under CWA Section 404, so EPA would steer clear of those questions. That's not entirely correct.[26] EPA routinely comments on the potential effects of stream crossings for FERC-certificated projects, as it did for the Project. JA1064–1072. In those reviews EPA regularly endorses dry open-cut stream-isolation techniques to prevent degradation of water quality.[27] And

---

[25] *See Sierra Club II,* 981 F.3d at 257 (rejecting attempted "end run around the [NGA's] narrow jurisdictional provisions").

[26] *See, e.g.*, *Mingo Logan Coal Co. v. USEPA*, 714 F.3d 608 (D.C. Cir. 2013) (vetoing Corps Section 404 permit due to water-quality concerns).

[27] *See, e.g.*, *Columbia Gas Transmission, LLC*, 170 FERC ¶ 61045, 61298–99 (2020) (recommending use of "dry trench" methods for crossing waterbodies to reduce sedimentation effects); *Trunkline Gas Co.*, 94 FERC ¶ 61381 (2001) (same).

the Corps repeatedly has concluded that properly executed dry open-cuts will cause no more than minimal adverse effects on the aquatic environment. *See, e.g.*, NWP12 Decision Document, at 122 (Jan. 4, 2021) ("The discharges of dredged or fill material into waters of the United States authorized by [NWP12]…will have no more than minimal individual and cumulative adverse effects on the aquatic environment ….").[28]

## V.    DEP complied with West Virginia's antidegradation policy.

The broad goal of West Virginia's antidegradation policy is to prevent discharges authorized by the CWA from degrading high-quality waters over time to a level that barely meets narrative and numeric standards. W. Va. Code R. § 47-2-4. But discharges causing only temporary water-quality effects do not hinder that goal, because they do not run the same risk of cumulating over time with the effects of other activities. So the antidegradation policy tolerates temporary effects on even the highest quality waters, such as mountain streams and other headwaters. W. Va. Code R. § 60-5-6.1; *see also Appalachian Voices*, 912 F.3d at 758; *SWCB*, 898 F.3d at 405 n.15. The task of measuring and evaluating how much extra pollution high-quality waters can tolerate is simply not implicated by short-term construction-induced effects.

---

[28] https://tinyurl.com/3btzw7dk.

DEP here concluded that, through implementation of "tried and true" BMPs, the effects on water quality from the Project's stream crossings would only be temporary. JA59–61. This conclusion is thoroughly uncontroversial. It is based on decades of experience by permitting authorities nationwide—including EPA, the Corps, and environmental protection agencies in nearly every State—and extensive research in the field. Even Petitioners themselves endorse it.[29]

Petitioners nonetheless argue (at 50–54) that DEP was obligated to perform what they call "location-specific antidegradation review." Petitioners are vague about the source of that obligation or what precisely it entails, but they seem to be referring to the collection of baseline water quality data for the "parameter of concern that is reasonably expected to be discharged" to evaluate whether the expected discharge would be significant using a formula in the regulations.[30] DEP identified a host of reasons why that type of analysis is not applicable for construction-related discharges. JA64. But one trumps all: The effects of dry open-cut crossings, when executed pursuant to the conditions imposed by WVDEP through the O&G CGP, are only temporary, JA58, and temporary impacts do not implicate the antidegradation policy. W.

---

[29] *See supra* note 23.
[30] *See* W. Va. Code R. §§ 60-5-3.4, -5.6.c.

Va. Code R. § 60-5-6.1; *see also Appalachian Voices*, 912 F.3d at 758; *SWCB*, 898 F.3d at 405 n.15. Each of Petitioners' arguments regarding the agency's compliance with the antidegradation policy founder on that key finding of fact.

### A. Site-Specific preconstruction antidegradation review specified in West Virginia's regulations is not required for discharges causing temporary effects on water quality.

Petitioners first accuse DEP of using "surrogates" for the preconstruction site-specific analysis they claim is required. They say the use of BMPs in lieu of site-specific review is reserved only for nonpoint source discharges. And they argue that DEP could not rely on findings made in prior analyses. Both of these arguments fail out of the gate, because Petitioners ignore DEP's conclusion that the use of BMPs will ensure the effects of stream crossings will only be temporary. JA58. The arguments fail on their own terms, too.

### 1. The use of BMPs is a "prophylactic," not a "surrogate."

Petitioners first accuse DEP (at 51) of impermissibly relying on the use of BMPs as a "surrogate" for site-specific analysis. They say (at 53–54) BMPs can only be used for nonpoint sources and that "more is required" for point source discharges associated with stream crossings. Petitioners' argument is wrong for two reasons.

At the threshold, the "surrogate" label is simply inaccurate. DEP has not required the use of enhanced BMPs as a substitute for site-specific

antidegradation review, but rather to ensure the need for such review is not triggered in the first instance. Put differently, the use of BMPs is not a "surrogate" but rather a "prophylactic." And nothing in West Virginia's regulations preclude the agency from requiring the use of tried-and-true practices to ensure the effects of construction-related discharges—whether classified as point or nonpoint—are only temporary.

Petitioners' assertion that "more is required" for point source discharges is also wrong. Petitioners (at 52–53) point to West Virginia's antidegradation policy, which requires that new and existing point sources "achieve the highest established statutory and regulatory requirements," while nonpoint sources must be subject to "cost-effective and reasonable [BMPs]." Petitioners suggest that the instream construction activity here, which involves point source discharges,[31] should be subject to additional legal requirements. But apart from referencing "location-specific antidegradation review" they never say what that something more should be.[32]

---

[31] The actual point source discharge associated with dry open cuts is the filling of the trench with native streambed material after pipeline installation. Because that activity is conducted in the dry, it does not cause mobilization of sediment in the stream. That occurs, if at all, when the isolation devices are removed and water flows over the construction area. That diffuse mobilization of stream bed material arguably does not qualify as a true "point source" discharge. But that distinction is immaterial.

[32] The "highest statutory and regulatory requirements" applicable to most point sources as set out in 40 C.F.R. § 130.12(a)(2) are the "technology-

45

There's a good reason for that—EPA itself has concluded that the use of BMPs is the best way to ensure water running through disturbed construction areas does not cause greater than temporary effects on water quality. Like West Virginia, EPA's antidegradation policy requires that the "highest" legal requirements be applied to point sources. 40 C.F.R. § 130.12(a)(2). Significantly, EPA considers stormwater discharges to be point source discharges. *See* 33 U.S.C. § 1342(p)(2)(B); 40 C.F.R. §§ 122.26(b)(14)(x) & 122.26(b)(15)(i). And, of course, EPA relies on enhanced BMPs to ensure those discharges are only temporary and result in no degradation in receiving streams. JA65. Petitioners' argument posits there must be something "higher" than what EPA requires for functionally identical types of discharges. But they never specify what that something is, an omission that speaks volumes.

---

based" and "water quality-based" effluent limits imposed by the NPDES permit program. *See Westvaco Corp. v. EPA*, 899 F.2d 1383, 1384 (4th Cir. 1990) (describing NPDES program). According to EPA, this language was added to its antidegradation rule to ensure that when a permitting agency decides to allow "significant degradation" of a Tier 2 water, the discharger is not thereby authorized to avoid the application of these otherwise required effluent limits. *See* EPA's Q&A, Question 18, *available at* https://tinyurl.com/2pjdnnmx.

    Discharges authorized under Section 404 are not covered by the NPDES program. For those discharges—to the extent they qualify as "point sources"—the "highest requirements" are delineated in the Section 404(b)(1) guidelines. 40 C.F.R. pt. 230. The Corps must ensure those guidelines are satisfied before issuing the Section 404 permit that would authorize the dry open-cut crossings.

## 2. DEP's reliance on the conclusions it reached through numerous previous reviews was entirely appropriate.

In *SWCB* and *Appalachian Voices*, this Court rejected the suggestion that, in evaluating a request for a Section-401 water-quality certification, a State must duplicate work it already has completed in evaluating the activity at issue. *See Appalachian Voices*, 912 F.3d at 754–55; *SWCB*, 898 F.3d at 407–08. West Virginia's antidegradation implementation regulations echo this common-sense principle:

> Information contained within existing environmental processes and reviews, such as environmental assessments, environmental impact statements, facilities plans, and findings of no significant impact, may be used to provide part or all of the requirements of the antidegradation procedure and review.

W. Va. Code R. § 60-5-1.5.d.

DEP quite appropriately relied on its extensive previous reviews of the Project to support its analysis here, including specifically its full analysis of the entire project—including all stream crossings—in authorizing Mountain Valley to rely on the O&G CGP. That review evaluated the Project's compliance with West Virginia's antidegradation requirements and concluded the use of BMPs would render the Project's construction-related effects temporary and insignificant. JA64–65. DEP also drew confidence from EPA's application of similar principles in its own CGP. JA64–65.

47

Petitioners say DEP's reliance on these previous reviews was inappropriate for three reasons. First, they say (at 54–55) section 1.5.d only allows the agency to rely on "data" collected in previous reviews, and does not allow the use of previous reviews to avoid the "process" that would otherwise apply. The text of the regulation says otherwise.

Section 1.5.d does not limit the agency to reliance on "data." It instead allows the agency to rely on "information," a broader term that would capture the bottom-line findings made through previous reviews.[33] And the regulation specifically notes that such "information" can "satisfy the requirements of the antidegradation *procedure* and review." W. Va. Code R. § 60-5-1.5.d. In all events, the key conclusion from the State's O&G CGP review—that the Project's construction-related effects, including those would be temporary and thus would not degrade State waters—was developed pursuant to West Virginia's regulations. If Petitioners think that analysis was legally deficient, Petitioners could have appealed it in 2017. They elected not to do so, and they cannot attack that State-law determination now.

Second, Petitioners say the agency could not rely on its previous reviews, because of "Mountain Valley's history of noncompliance" and DEP's failure

---

[33] *See Information*, MERRIAM-WEBSTER, https://tinyurl.com/2p8v37v9 ("[K]nowledge obtained from investigation, study, or instruction.").

48

to mandate permit compliance as a condition of the certification. But DEP

separately considered the Project's compliance history, *see supra* Section I, and

found it did not undermine its assurance that the Project would not violate

water-quality standards. And Petitioners are simply incorrect that compliance

with the O&G CGP is not a condition of the certification. *See supra* Section II.

Third, Petitioners say DEP could not rely on information developed in

EPA's stormwater permit analysis, because that permit does not cover

instream activity. But DEP did not rely exclusively on EPA's analysis as to

instream work. It instead relied on its own site-specific study of the Project in

approving use of the O&G CGP. *See supra* Section IV.

### B. DEP requires compliance with the Mitigation Framework, which documents preconstruction conditions and requires full site restoration.

Petitioners go on (at 57–61) to argue that "location-specific" review is

"required, possible, and valuable." Here, Petitioners merge two distinct

concepts—(1) the preconstruction measurement of baseline levels of certain

pollutants to predict whether discharges will be "significant"; and (2) the

assessment of baseline conditions so that the agency can later confirm that

postconstruction effects projected to be temporary are, in fact, only temporary.

As for (1), the specific type of review Petitioners reference is not

"required" for temporary discharges. W. Va. Code R. § 60-5-6.1; *see also*

49

*Appalachian Voices*, 912 F.3d at 758; *SWCB*, 898 F.3d at 405 n.15.  So even if

"valuable" or "possible," the decision whether to conduct such an analysis is

entirely within the agency's discretion.

As for (2), no specific regulation requires that type of analysis either.  But

DEP actually agrees that understanding baseline conditions is critical for

assessing the Project's actual impacts.  That is why it mandated compliance

with the Mitigation Framework.

The Mitigation Framework imposes robust obligations on Mountain

Valley.  It requires Mountain Valley collect site-specific data for each stream

and wetland crossing, monitor conditions at each location during construction

and for three years after to ensure streams meet defined performance

standards, including six standards specific to streambeds, and then, if those

performance standards are not being met, to take corrective action so that

streams are fully restored to preconstruction conditions—thereby ensuring that

effects are temporary and insignificant.  *See supra* at 14–17.

Petitioners do not challenge any aspect of the Mitigation Framework.

Indeed, they ignore it altogether and then wrongly accuse DEP (at 58) of

failing to "examine an important aspect of the problem."  But DEP *did*

consider that aspect of the problem, so Petitioners' contentions regarding what

might have been "valuable" or "possible" are nothing more than complaints

50

over how the agency chose to address the problem.  Such quibbles do not make the agency's work arbitrary or capricious.  *United States Forest Serv.*, 897 F.3d at 597.

Petitioners' prescriptions lack merit in any event.  For example, Petitioners tout the benefits of collecting information on benthic macroinvertebrates as a means of predicting the Project's potential effects.  But that information provides little insight for predicting the Project's water-quality impacts.  True, the West Virginia Stream Condition Index (WVSCI) can be used as a measure to assess whether a water body is meeting narrative water-quality criteria.  And Mountain Valley collected baseline benthic data from all streams that had habitat conditions suitable for sampling under DEP protocols and proposed to use those data as a measure of compliance and to trigger any necessary mitigation.  JA149–150.  But while benthic assessment tools like the WVSCI can be used to detect impairment, "they do not identify the cause or causes of that impairment."  *Ohio Valley Envtl. Coal., Inc. v. McCarthy*,    CA 3:15-0271, 2017 U.S. Dist. LEXIS 20392, at *10 (S.D. W. Va. Feb. 14, 2017), *rev'd in part on other grounds* by *Ohio Valley Envtl. Coal. v. Pruitt*, 893 F.3d 225 (June 20, 2018).  And without some metric for correlating increased suspended

51

sediment concentrations with WVSCI scores—Petitioners identify none[34]—there is no reliable basis to predict what effect momentary increases in suspended sediment might have on the downstream benthic environment.

Petitioners also argue that DEP should have done more to evaluate conditions at completed crossings. But those crossings were completed without the benefit of the comprehensive preconstruction baseline data the Mitigation Framework now requires Mountain Valley to collect. So evaluation of current conditions at those locations is not particularly useful. And notwithstanding the constant scrutiny the Project has endured, Petitioners identify no completed crossing in West Virginia that shows evidence of long-term Project-related degradation of water quality.[35]

---

[34] Petitioners claim (at 59) that the "scientific literature" recommends the collection of pre-crossing habitat and benthic information "in order *to predict* the potential effects of open-cut, dry-ditch crossings...." (citing JA30). But, the cited paper says no such thing. It merely recommended collection of pre-crossing baseline data for "use in [post-construction] *effect assessment*." JA31 (emphasis added). The citation provides no method for using the baseline date for *predictive* purposes.

[35] Petitioners do cite (at 60) one example from Virginia, where they say effects of the stream crossing are still being experienced three-plus years after the crossing was completed. In support, they cite a comment submitted after the close of the public comment period and thus waived. Petitioners did reference this particular crossing in an earlier comment generally attacking the efficacy of stream crossings and noting difficulties associated with that crossing. JA809. But as Mountain Valley noted in response, this particular crossing—one of dozens completed in 2018—shows how adaptive-management conditions like those West Virginia has imposed work to ensure crossings do not cause violations of water-quality standards. JA1616–1617.

## <u>CONCLUSION</u>

The Court should deny the Petition for Review.

This 7th day of June 2022.

Respectfully Submitted,

 /s/ George P. Sibley, III

George P. Sibley, III
J. Pierce Lamberson
gsibley@hunton.com
plamberson@hunton.com
**HUNTON ANDREWS KURTH LLP**
951 E. Byrd St.
Richmond, VA 23219
(804) 788-8716

Deidre G. Duncan
dduncan@hunton.com
**HUNTON ANDREWS KURTH LLP**
2200 Pennsylvania Ave., NW
Washington, DC 20037
Telephone:  (202) 955-1919

Robert G. McLusky
Jennifer L. Hughes
rmclusky@jacksonkelly.com
jlhughes@jacksonkelly.com
**JACKSON KELLY PLLC**
500 Lee Street East
Charleston, WV 25301
Telephone:  (304) 340-1381

Justin W. Curtis
justin@aqualaw.com
**AQUALAW PLC**
6 South 5th Street
Richmond, Virginia 23219
Telephone:  (804) 716-9021

*Counsel for Mountain Valley Pipeline, LLC*

**CERTIFICATE OF COMPLIANCE**

I hereby certify that this filing complies with the type-face requirements of Fed. R. App. P. 32(a)(5) and the type-volume limitations of Fed. R. App. P. 28(b).  This Response Brief contains 10,904 words, excluding the parts of the filing excluded by Fed. R. App. P. 27(d)(2) and 32(f).

/s/ George P. Sibley, III
*Counsel for Mountain Valley Pipeline, LLC*

## CERTIFICATE OF SERVICE

I hereby certify that on June 7, 2022, I electronically filed the foregoing

with the Clerk of Court using the CM/ECF System which will automatically

send e-mail notification of such filing to all counsel of record.

<u>/s/ George P. Sibley, III</u>

*Counsel for Mountain Valley Pipeline, LLC*